UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MAKSIM LUTSKOV, | ) | |
| Petitioner. | ) | |
| | ) | Legal Memorandum In Support Of |
| v. | ) | Petition Under 28 U.S.C. §2254 |
| | ) | For Writ Of Habeas Corpus |
| LOIS RUSSO, | ) | |
| SUPERINTENDENT OF | ) | |
| SOUZA-BARONOWSKI | ) | |
| CORRECTIONAL CENTER | ) | 04-12601 PBS |
| | ) | |

Now comes the Petitioner, Maksim Lutskov, and submits this Legal Memorandum In Support of his Petition Under 28 U.S.C. § 2254 For Writ of Habeas Corpus.

LEGAL ARGUMENT[1]

I. THE ADMISSION INTO EVIDENCE OF MAKSIM'S DECISION NOT TO ANSWER THE DETECTIVE'S QUESTION CONCERNING WHO HE WAS WITH AT SIX FLAGS ON THE DAY OF THE INCIDENT VIOLATED HIS RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

The admission into evidence of Maksim's decision not to answer the detective's question concerning who he was with at Six Flags on the day of the incident violated his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. See Doyle v. Ohio, 426 U.S. 610 (1976); Miranda v. Arizona, 384 U.S. 436 (1966). See also Commonwealth v. DePace, 433 Mass. 379, 386 (2001).

A defendant's silence after the police have given the warnings mandated by Miranda v. Arizona, 384 U.S. at 467-479, may not be used against that defendant.... [T]o do so would

---

[1] The Record Appendix to the Petitioner's Appellate Brief filed in the Massachusetts Appeals Court shall be cited herein as (R.A. ), citations to the trial transcript shall be cited by transcript volume and page, e.g., (1/10), and where no volume is designated, by date and page, e.g., (Oct.30/10).

1

'penalize' the invocation of the right to silence." Commonwealth v. Waite, 422 Mass. 792, 797 (1996), citing Doyle v. Ohio, 426 U.S. at 618. "The right to the advice of counsel would be of little value if the price for its exercise is the risk of an inference of guilt." Commonwealth v. Person, 400 Mass. 136, 141 (1987), quoting Commonwealth v. Burke, 339 Mass. 521, 533 (1959), rev'd on other grounds, Commonwealth v. Beldotti, 409 Mass. 553 (1991). Indeed, the Supreme Court said in Doyle v. Ohio, 426 U.S. at 618, that, "while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings."

In this case, there is no question that such evidence was "used as evidence of guilt." Commonwealth v. Cobb, 374 Mass. 514, 521 (1978). Detective Donald Brown of the Springfield police department, who testified (for no particular reason) that he had experience working with "gang members," interrogated Maksim at the Springfield police department on November 13, 2000. (5/140-141, 174). After Miranda rights had been read and Maksim signed a "Miranda Warnings" form, Maksim indicated a willingness to talk. (5/183, 187). Maksim, who had been brought up from his cell (5/215), signed and initialed the Miranda Warnings sheet (5/217-218). Maksim then denied any involvement in the home invasion, and explained that he had been at the Six Flags amusement park with some friends on the day in question. (5/184).

Next during this direct examination by the prosecutor, Detective Brown testified that when he asked Maksim the names of those friends, Maksim would not provide those names to him. (5/184). Detective Brown testified that "[a]fter initially denying [involvement], his response was that he was at Six Flags amusement Park with some friends." (5/184). But when asked if Maksim had been asked to reveal the names of those friends, Detective Brown

testified that Maksim would not give them the names of his friends. (5/184). To make matters even worse, the Miranda Warnings form was entered into evidence by the prosecutor, containing the following notation handwritten by the detective: "Stated was at Six Flags with friends. Wouldn't give names of friends." (R.A. 19; 5/183, 208).

As this testimony makes clear, there can be no question that Detective Brown's testimony, given in response to the prosecutor's questioning on direct examination, and the admission into evidence of the detective's notation on the Miranda Warnings form signed by Maksim, violated Maksim's Constitutional rights. See, e.g., Commonwealth v. Cobb, 374 Mass. 514, 521 (1978) (evidence of defendant's post-Miranda statement, "What can I say?," deemed exercise of intention to remain silent, improperly introduced during Commonwealth's case-in-chief). See also Commonwealth v. DePace, 433 Mass. at 381 (detectives testified that the defendant wrote, "I want to talk to my attorney" on the Miranda rights form signed by the defendant, and that form was admitted as an exhibit).

On cross-examination, when the defense attorney asked, "And Mr. Lutskov said he didn't want to tell him who he was with?" Detective Brown replied, "That's correct. Yes." (5/203). Detective Brown further testified on cross-examination that, "I believe [Maksim] answered a few questions. I don't think he exactly said he was willing to speak with us." (5/205). Detective Brown also testified on cross-examination that although Maksim had been interrogated for 30 minutes, the only thing written down by the police on the Miranda Warnings form was "I was at Six Flags with friends," and then Maksim refused to give the names of those friends. (5/208).

On redirect, the prosecutor could not let this issue alone. The prosecutor, reading from a police report not entered into evidence,[2] asked whether the police report of the interrogation stated, "'I then asked him to tell me the names of these friends so that I can locate them,' and it goes on from there and he said that he didn't wish to tell me who he was with. . . .," to which the detective responded, "That's correct." (5/222-223). Once again, there can be no doubt that Maksim's Constitutional rights were violated by Detective Brown's comments on Maksim's decision to remain silent.[3] See Doyle v. Ohio, 426 U.S. at 619, (evidence of post-arrest silence used for the substantive purpose of permitting an inference of guilt or to impeach an exculpatory story violates the due process clause of the Fourteenth Amendment). See also Commonwealth v. Brum, 438 Mass. 103, 119 (2002) (improper where two detectives "testified concerning the defendant's first statement to the police, and both related that, after giving his own narrative and answering a couple more specific questions, the defendant stated that he did not want to answer any more questions").

The Commonwealth's case had both its strong points and weak points. The obvious, glaring weakness of the Commonwealth's case is that although Fulia and Ahmet Aiken both got a look at the shooter (allegedly Maksim) after his mask fell off, and even gave descriptions

---

[2] The police report, marked as Exhibit 2 for Identification, states in pertinent part: "I then asked that he tell me the names of these friends. . . . He told me then that he didn't wish to tell me whom he was with." (R.A. 19; 5/226).

[3] At a sidebar, the prosecutor explained: "Now, if we wanted to get into a whole legal battle, he basically asserts his rights thereafter and clearly we don't want to get into that issue, so he indicated he did not wish to give a witness statement but he did talk to the officers. They asked him – they told him they wanted to talk to him about October 31, 1999. He told them I was at Six Flags with friends. When they asked him who were you with, he refused to tell them. They asked him another question, and he blared up." (5/179). Later at the same sidebar, the prosecutor explained: "They Mirandized him, he made an oral statement, they had wrote it down, he did not wish to talk with them at that point. He tells them he wished – I don't know exactly what words he used, but basically he told them he wasn't interested in speaking to them." (5/181).

4

of the shooter to the police, they could not identify his picture at the police station (despite being shown his picture), <u>and did not even identify him at trial</u>. (4/43-44, 49, 57, 60-61, 67, 74, 169-170). Furthermore, neither the gun nor the costumes were recovered, and Maksim did not have any bruises about his head or body the day after the home invasion that one would expect if he were hit with a pot by Ahmet Aiken. (4/45, 165)

The evidence against Maksim (omitting of course the statement to the police challenged here, which never should have been used against him), consisted primarily of the intercepted prison telephone call; the fingerprint evidence; and the testimony of the Commonwealth's cooperating witness, Koba.

As to the telephone call that Maksim allegedly made from prison to his mother admitting that he shot Ahmet, as argued in Section II, <u>infra</u>., this evidence should not have even been admitted, where the Commonwealth lost or destroyed the audiotape of the alleged conversation, thus depriving Maksim of any reasonable chance to cross-examine the correctional officer who listened to the alleged call. In addition, the telephone call evidence obviously did not sit well with all jurors, as evidenced by the jury question concerning whether the jury had to reach a unanimous decision on the "points of law" concerning the telephone call (R.A. 22-23; 7/119-142). Thus, the evidence of an alleged telephone call Maksim made to his mother from prison cannot said to be powerful evidence against Maksim. As to the fingerprint on the mask, this evidence is easily explained by the fact that Maksim was with Koba and Artem when they bought Halloween costumes together (4/220), and thus is also not powerful evidence that Maksim participated in the home invasion.

Lastly, as to Koba's testimony, it suffers from the obvious defects of any witness cooperating with the Commonwealth in the hopes of receiving some undefined beneficial

treatment – and of a boy who was terrified of the position he found himself in with the police, a boy who would say anything to keep himself from spending the next twenty years in prison. The police told Koba that they had his fingerprints (which was not true); that the penalty for home invasion was twenty years in prison; and told him that he might be deported. (4/17, 145, 212, 238). Koba, who was just 19 years old at the time, started shaking at some point during the <u>six-hour</u> police interrogation, and only then suggested that he was willing to cooperate with the police. (4/145, 180, 212). For testifying against Maksim, Koba was told that his cooperation would be taken into consideration, and a "cooperation agreement" was entered into between his attorney and the District Attorney's office. (4/238, 245).

Finally, by Koba's own admission he had a motive for pointing the finger at Maksim. Koba testified that he had known Maksim and Artem for about one year prior to the incident. (5/214). He admitted that he was not friends with Maksim – they had had "difficulties" prior to the incident. (5/5-7). He also admitted that just a few days before the home invasion he and Maksim had a fight, and that bitter feelings remained between them. (5/23-24). As all of the foregoing demonstrates, Koba's testimony was far from what could be called "powerful" evidence; rather, is was entitled to as much or as little weight as the jury decided to give it, which considering Koba's cooperation agreement, his bitter feelings toward Maksim, and the inconsistencies between his testimony and the other evidence, may not have been as great as the Commonwealth would like to think (which was no doubt why the Commonwealth introduced evidence in violation of Maksim's Constitutional right to remain silent, and pushed so hard to introduce the telephone call evidence despite the Commonwealth's own loss and

destruction of the audiotape – to prop up a case that relied almost entirely on Koba's questionable testimony).[4]

As the foregoing demonstrates, the Commonwealth's case was not so substantial as to tip the balance in the Commonwealth's favor. As such, Maksim is entitled to a new, and fair trial, where evidence that he exercised his right to remain silent will not be used against him. See Commonwealth v. Mahdi, 388 Mass. at 698, ("The weight of the evidence alone is not sufficient, however, to make the district attorney's comments harmless error. The nature of a Doyle error is so egregious that reversal is the norm, not the exception").

II. THE COMMONWEALTH'S LOSS AND DESTRUCTION OF THE AUDIOTAPE OF THE TELEPHONE CONVERSATION BETWEEN MAKSIM AND HIS MOTHER, IN WHICH MAKSIM ALLEGEDLY ADMITTED TO HAVE SHOT AHMET AIKEN, EFFECTIVELY PREVENTED MAKSIM FROM CROSS-EXAMINING THE WITNESS WHO TESTIFIED THAT SUCH A CALL TOOK PLACE, IN VIOLATION OF HIS DUE PROCESS RIGHT TO A FAIR TRIAL AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE 12 OF THE MASSACHUSETTS DECLARATION OF RIGHTS, WHICH PROVIDES EVEN GREATER DUE PROCESS PROTECTIONS.

The Commonwealth's loss and destruction of the audiotape of the alleged telephone conversation between Maksim and his mother violated his due process rights under the Fifth and Fourteenth Amendments of the United States Constitution and article 12 of the Massachusetts Declaration of Rights to the disclosure by the government of evidence in its possession that could materially aid the defense. See Arizona v. Youngblood, 488 U.S. 51 (1988); Commonwealth v. Tucceri, 412 Mass. 401, 404 (1992). The rule under the due

---

[4] Indeed, had Maksim's refusal to tell the police who he was with at Six Flags been precluded, and had the evidence concerning his telephone call to his mother been excluded (as argued infra.), the jury may very well have concluded that Koba's testimony alone was not sufficiently reliable to find Maksim a youthful offender.

process provisions of the Massachusetts Declaration of Rights is stricter than the Federal rule. See Commonwealth v. Phoenix, 409 Mass. 408, 412 n. 1 (1991).

"Whenever potentially exculpatory evidence is lost or destroyed, the judge must weigh (1) the Commonwealth's culpability as to the lost evidence; (2) the materiality of the lost evidence; and (3) the potential prejudice to the defendant as a result of the unavailability of the evidence." Commonwealth v. Otsuki, 411 Mass. 218, 231 (1991). Each of the prongs of what is sometimes referred to as the "Willie test," see Commonwealth v. Willie, 400 Mass. 427, 432 (1987), will be examined in turn.

### A. The Evidence Was Potentially Exculpatory.

A defendant who seeks relief from the loss or destruction of potentially exculpatory evidence has the initial burden, Commonwealth v. Olszewski, 416 Mass. 707, 714 (1993), cert. denied, 513 U.S. 835, 115 S.Ct. 113, 130 L.Ed.2d 60 (1994), to establish "a 'reasonable possibility, based on concrete evidence rather than a fertile imagination, 'that access to the [evidence] would have produced evidence favorable to his cause." Id. (citations omitted). See also Commonwealth v. Neal, 392 Mass. 1, 12, (1984).

Exculpatory evidence does not mean evidence that proves the defendant is innocent. Rather, exculpatory evidence includes "evidence which provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." Commonwealth v. Castro, 438 Mass. 160, 168 (2002). See also Commonwealth v. Gregory, 401 Mass. 437, 442 (1988), quoting Commonwealth v. Ellison, 376 Mass. 1, 22 (1978). Here, if the audiotape of the alleged conversation between Maksim and his mother had been turned over to the defense,

there is a reasonable possibility that it would have produced evidence to refute the most damaging evidence presented by the Commonwealth: Officer Orel's testimony that Maksim admitted to his mother, several times, that he was involved in the home invasion and had shot Ahmet Aiken – and that he had no remorse for doing so.

Here, because the Commonwealth did not preserve the tape, there is no way to know for certain what the tape would have revealed. "Where evidence is lost or destroyed, it may be difficult to determine the precise nature of the evidence." Commonwealth v. Neal, 392 Mass. at 12. However, it is well settled that the defendant "need not show conclusively the exculpatory nature of the destroyed evidence." Commonwealth v. Sasville, 35 Mass. App. Ct. 19, 20 (1993). In this case, while it is indeed difficult to determine the precise nature of the lost audiotape of the telephone conversation between Maksim and his mother (assuming there was, in fact, a conversation at all), there can be no genuine dispute that there is a real possibility that the tape would have included valuable exculpatory material. Despite Officer Orel's testimony that Maksim admitted to shooting the owner of the house (Ahmet), the tape could have proved that Officer Orel's translation of the call (which took place in Russian), was not correct; that anything inculpatory that Maksim might have been sarcastic, or said in jest (Officer Orel testified that Maksim laughed after making an inculpatory statement; had the jury been able to hear the laugh, it could have determined whether Maksim laughed because he was being sarcastic or jesting, or because (as the Commonwealth suggested) he was so callous that he thought it was funny that he had shot a man); that the call never took place at all; that Officer Orel did not remember the conversation correctly; that Officer Orel's testimony exaggerated the words used or the definitiveness of the alleged admission; that the voice on the telephone was not Maksim's; that the Officer did not hear the entire conversation, or was only

9

relaying part of the conversation and took portions of it out of context, or any number of things that would have aided Maksim's defense.

While the Commonwealth will no doubt fall back on a claim that Maksim was provided with a full and fair opportunity to cross-examine Officer Orel, the simple truth is that without the tape there was absolutely no way to discredit or impeach Officer Orel, or to raise the issues listed in the preceding paragraph, because Officer Orel could simply, as he did, stand by his assertion that he heard the conversation clearly and remembered it well, knowing that the defense could not possibly impeach him.

However, had the Commonwealth provided the tape to the defense, as it should have done, there is a very real possibility that the tape would have contained evidence to discredit and impeach Officer Orel's version of the alleged conversation. See, e.g., Stuart v. State, 907 P.2d 783, 816 (Idaho 1995) (destroyed jail telephone logs would have had "exculpatory value" in prisoner's prosecution for murder by torture). In these circumstances, had the Commonwealth not lost and destroyed the tape recording of the alleged conversation, there is a very real probability that it would have contained information helpful to the defense's attempts to limit the substantial damage done by Officer Orel's testimony. As such, it certainly would have aided Maksim's case, and therefore Maksim has carried his initial burden to show a real possibility that the evidence would have contained exculpatory material. See Commonwealth v. Sasville, 35 Mass. App. Ct. at 25 ("In any event, negative paternity tests would, without question, have been a real factor in the jury deliberations"). That is all the defendant has to show. See Commonwealth v. Neal, 392 Mass. at 12 ("To require the defendant at this stage to prove that the [evidence was] in fact exculpatory would . . . convert the disclosure duty established by Brady and its progeny into an 'empty promise, easily

circumvented by suppression of evidence by means of destruction rather than mere failure to reveal'"), quoting United States v. Bryant, 439 F.2d 642, 648 (D.C. Cir. 1971).

> B. The Commonwealth Was Highly Culpable For The Loss and Destruction of the Alleged Audiotape.

The first prong of the "Willie" test requires the Court to consider the "the Commonwealth's culpability as to the lost evidence." Commonwealth v. Otsuki, 411 Mass. 218, 231 (1991). In this case, there can be no question that the Commonwealth was, at the very least, grossly negligent, and therefore certainly highly culpable for the loss and destruction of the audio-taped conversation. See Commonwealth v. Kater, 432 Mass. 404, 417-418 (2000) (state is "culpable" for loss or destruction of evidence if the evidence has been lost or destroyed through its negligence or inadvertence).

In January or February of 2001, a request was made by Assistant District Attorney Donna S. Donato (the trial prosecutor) of the Hampden County District Attorney's Office, to monitor Maksim's calls. (6/43). Officers such as Officer Kenney routinely monitor calls for the District Attorney's office, and Correctional Officers from time to time – at a prosecutor's request - monitor or record telephone calls made by inmates. (6/42).

On a request by the prosecutor, in January or February 2001, Correctional Officer Gregoriy Orel was assigned by Officer John Kenney, the Deputy Chief of Security at the Hampden County House of Correction, to monitor Maksim's calls and to act as an interpreter (as Maksim and his mother spoke Russian). (Oct. 30/60-61; 6/44, 66-67). The proper procedure for a prosecutor to preserve the audiotape of an inmate's telephone call is to serve a subpoena on Officer Kenney's office specifically designating the tape to be saved. (Oct. 30/4-6; 6/58).

However, the prosecutor did not timely serve a subpoena; rather, the prosecutor did nothing more than leave a handwritten note on John Kenney's desk sometime after the telephone call was monitored, requesting Officer Kenney to save the tape of the telephone call. (6/47, 57). Over the course of the next four to five months, the prosecutor and Officer Kenney had conversations between the time he received her note and the time he got the subpoena. (6/48). However, inexplicably, not until May 2001 (four to five months after the telephone call was monitored) did the prosecutor serve Officer Kenney with a subpoena to preserve and turn over a tape of the monitored telephone call.[5] (6/47, 58). Of course, by now it was too late; Officer Kenney was now unable to provide recordings because the digital tapes had been re-used (i.e. taped over) in the usual course.[6] (6/48, 60-63). Officer Kenney specifically testified that he did not have the tapes made after he received the prosecutor's handwritten note because the proper procedure to trigger the preservation of the tapes was for a prosecutor to

---

[5] During the hearing on the Motion in Limine, the prosecutor admitted that "I left [Officer Kenney] a note indicating that I would be interested in certain recordings that were made, and I would send him a subpoena to that effect," (Oct.30/28), but she did not serve the subpoena until over four months later - after the tape had been taped over. (6/48; 47, 58, 60-63).

[6] The telephone system allowed inmates to make collect calls only to approved telephone numbers from their "pods," and each inmate was assigned a PIN number to do so. (Oct. 30/61-62; 6/34). The recording warns people that the calls may be monitored or recorded. (Oct. 30/63-64; 6/36). Calls are recorded and stored in a WAV file, which is a computer file stored on a hard drive on the main telephone server in the computer room. (Oct. 30/69; 6/38). When the hard drive reaches its capacity, it "dumps" calls into a "storage capacity," which is a digital audiotape. (Oct. 30/70; 6/39). Each digital audiotape has a "huge" storage capacity, and is kept in the library. (6/39). The computer controls what is "dumped" from the WAV to the digital audio tape. (Oct. 30/70-71; 6/39). Calls stay on the WAV for 2-4 weeks. (Oct. 30/69-72; 6/40). When the digital audiotapes are full, the oldest tape by date is taped over. (Oct. 30/70-72; 6/40). A call can be preserved permanently only by pulling the digital tape and making a standard tape cassette recording of it. (Oct. 30/69-72; 6/41). However, once it is dumped from the digital audiotapes (as it was in this case due to the prosecutor's failure to timely serve a subpoena), it is lost forever. (Oct. 30/69-72, 78-79; 6/41).

serve a subpoena, which the prosecutor did not do until May 2001 (4 to 5 months after the call) – after the tape had been taped over in the regular course. (6/58).

As these undisputed facts make clear, there can be no question that the Commonwealth was responsible for the loss and destruction of the audiotaped conversation, as it did not follow the proper procedure (serving a subpoena) to preserve the tape, and instead did nothing more for the next four to five months than simply leave a handwritten note on Officer Kenney's desk telling him that a subpoena would be served at some future time. This sloppy conduct cannot be said to even rise to the level of a diligent or earnest effort to preserve the tape. See, e.g. People v. Kelly, 467 N.E.2d 498, 500 (N.Y. 1994) ("Where discoverable evidence gathered by the prosecution or its agent is lost, the People have a heavy burden of establishing that diligent, good-faith efforts were made to prevent the loss"), and State v. Bailey, 144 Vt. 86, 94-95 (1984) ("[T]he government should be held to the standard of showing 'earnest efforts' to preserve crucial materials"), both cases cited with approval in Commonwealth v. Willie, 400 Mass. at 432 & 435 (1987) (Liacos, J., concurring in part, dissenting in part).

As even the prosecutor suggested (Oct.30/31), it was the prosecutor's negligence (at the very least) that caused the loss and destruction of the alleged telephone call between Maksim and his mother. Thus, it cannot be fairly disputed that the Commonwealth was culpable. See Commonwealth v. Garrey, 436 Mass. 422, 442 n.12 (2002) (prosecutor has an affirmative obligation diligently to search for and preserve materials that are discoverable in every criminal case; a lackadaisical attitude with regard to this responsibility is unacceptable in any criminal prosecution, and most emphatically so in a prosecution of murder). That is particularly so where Officers Kenney and Orel were acting as agents for the prosecutor as they helped her intercept and translate the alleged telephone call, and as such the prosecutor

had, at the very least, constructive possession of the audiotape. See, e.g., Commonwealth v. Sasville, 35 Mass. App. Ct. at 20 (where Commonwealth instructed physician that blood tests on a fetus would not be necessary, causing physician to dispose of fetus, Court concluded that the Commonwealth had constructive control over the fetus, and was therefore culpable for its destruction). See also Commonwealth v. Woodward, 427 Mass. 659, 679 (1998) ("The prosecuting attorney's obligations . . . extend to material and information in the possession or control of members of his staff and of any others who have participated in the investigation or evaluation of the case and who either regularly report or with reference to the particular case have reported to his office"); Commonwealth v. St. Germain, 381 Mass. 256, 261-262 n.8 (1980), quoting ABA Standards for Criminal Justice, Standards Relating to Discovery and Procedure Before Trial 2.1(d) (Approved Draft 1970).

    C.    <u>Materiality</u>.

The second prong of the "<u>Willie</u> test" is the materiality prong. "Undisclosed exculpatory evidence is 'material' if, 'evaluated in the context of the entire record,' it 'creates a reasonable doubt that did not otherwise exist.'" Commonwealth v. Gregory, , 401 Mass. at 442, quoting United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). However, "[w]hen the evidence no longer exists and the defendant has made a specific request for it, the defendant need only show a reasonable possibility that the evidence was exculpatory." Commonwealth v. White, 47 Mass. App. Ct. 430, 433 (1999)), citing Sasville, 35 Mass. App. Ct. at 26, n.11.

In this case, although Maksim did not make a specific request, a specific request would have been "fruitless." See, e.g., Commonwealth v. Neal, 392 Mass. at 12 ("[I]n this case a specific request would have been fruitless given that the ampules were routinely discarded after

the defendant's breathalyzer test"). Where the defense had no opportunity to make a specific request because the Commonwealth lost the evidence <u>before</u> the defense ever knew it existed, and because the evidence is something that the defense obviously <u>would have specifically requested</u> (as opposed to a simple general <u>Brady</u> request) had it known of its existence, fairness and, indeed, due process, requires that this case be judged on the lesser standard used where a specific request has been made. See, e.g., <u>Commonwealth v. Sasville</u>, 35 Mass. App. Ct. at 26, n.11 ("Here, the evidence was destroyed before the defendant knew of its existence, and, therefore, there was no specific request"). See also <u>Commonwealth v. Neal</u>, 392 Mass. at 11 n.10 ("Distinctions have been drawn between the standard of materiality to be applied where the prosecution fails to supply evidence specifically requested by the defendant, and the standard in cases where no request or only a general request for <u>Brady</u> evidence has been made").

In any case, under either test, there can be no doubt that the lost audiotape conversation was "material" to Maksim's defense, as it would have affected the outcome of the trial, and certainly would have, at the very least, been a real factor in the jury's deliberations. See <u>Commonwealth v. Sasville</u>, 35 Mass. App. Ct. at 26 n.11 (if defendant made a specific request for undisclosed exculpatory evidence, new trial is required if the undisclosed evidence might have affected outcome of the trial; if no request or only a general request was made, test is whether the undisclosed evidence would have been a real factor in jury's deliberations).

As argued above, if the Commonwealth had not lost the audiotaped conversation, an examination of the tape probably would have produced evidence helpful to the defense to defuse or, very likely, completely discredit Officer Orel's damaging testimony. Without the audiotape, there was simply <u>no way</u> for the defense to cast any doubt on Officer Orel's

insistence that Maksim had admitted that he shot Ahmet Aiken, and that far from showing any remorse, he seemed to brag about it. This evidence was so damaging that any assistance the tape could have provided to the defense would not only be "material," it would be invaluable. Thus, in these circumstances, there can be little doubt that the lost or destroyed evidence was highly material. See Commonwealth v. Harwood, 432 Mass. 290, 296 (2000) (original letter purportedly signed by defendant's employer was material to prosecution of defendant for insurance fraud and larceny in connection with his application for workers' compensation benefits, where defendant's employer testified under immunity that he had not signed letter, there was evidence that employer had made statements to insurance fraud bureau that were consistent with content of letter, and defendant's handwriting expert stated that authorship of signature on letter could not be determined based on quality of photocopy of letter); Commonwealth v. Woodward, 427 Mass. at 680 ("On the second prong of the test - materiality of the lost evidence - we conclude that the missing right side section of dura was material to Woodward's theory of the cause of Matthew's death"); Commonwealth v. Phoenix, 409 Mass. 408, 414 (1991) ("Evidence of the alleged bullet hole was material to the defendant's case because of the Commonwealth's theory that the defendant constructed a homemade silencer. The hole could have been material evidence of how the murder weapon was used"); Commonwealth v. Neal, 392 Mass. at 11 (evidence deemed material where "if the signature on the letter was not a forgery, the Commonwealth's principal witness may be impeached and the defendant's case substantially advanced).

    C.    <u>The Loss And Destruction Of The Rape Kit Prejudiced The Defendant's Cause</u>.

The third and final prong of the "Willie" test requires the Court to consider "the potential prejudice to the defendant as a result of the unavailability of the evidence."

16

Commonwealth v. Otsuki, 411 Mass. 218, 231 (1991). Here, because the evidence concerning the alleged telephone conversation between Maksim and his mother was so powerful, and so incriminating, the resulting prejudice from the Commonwealth's loss of the audiotape of the conversation – which effectively precluded Maksim from cross-examining Officer Orel - is, like the culpability and materiality prongs of the balancing test, extremely high.

The Commonwealth's loss of the audiotape effectively assured that Officer Orel's testimony would go to the jury unchallenged. See, e.g., Commonwealth v. Sasville, 35 Mass. App. Ct. at 27 (where Commonwealth's loss of evidence effectively precluded defendant from cross-examining key witness, the absence of the lost evidence created a strong possibility of prejudice). Officer Orel was certainly a key witness, and his testimony was extremely powerful, as it essentially amounted to an admission by Maksim that he was involved in the home invasion and that he himself had shot Ahmet Aiken – and felt no remorse for doing so.

Officer Orel testified that while listening to a conversation between Maksim and his mother, he heard Maksim's mother ask, "Why are you in jail." (6/112, 117, 153, 156). Maksim responded, "I killed a fucking guy. . . .I shoot him. . . . I never be [sic] shot him if he didn't hit me with the pan." (6/156). His mother said, "No, no, you didn't do it," but he replied, "No, I did. I shot him several times." (6/156). His mother said, "You didn't kill him," and Maksim replied, "The next time he'll get more, he deserve more." (6/156).

This extremely damaging testimony went essentially unchallenged. That is because, although the telephone conversation was tape-recorded, neither the correctional officers nor the Assistant District Attorney, who was present during the telephone call, made the proper arrangements to save the tape. (6/47-67). The Commonwealth's failure, of course, did not penalize the Commonwealth at all, as it had the benefit of Officer Orel's extremely damaging

17

testimony. Rather, only Maksim was prejudiced, because without the tape he had no way to cross-examine Officer Orel. Had the tape been turned over to the defense, as it should have been, the tape would have provided invaluable information to cross-examine Officer Orel, as set forth above.

The loss of the audiotape cannot be dismissed as harmless simply because Maksim had the right to cross-examine Officer Orel. The fact is that without the tape there was absolutely no way to discredit or impeach Officer Orel, or to raise the issues listed earlier on cross-examination, because Officer Orel could simply, as he did, stand by his assertion that he heard the conversation clearly and remembered it well.

Finally, the Commonwealth and its agent's sloppy (at best) work resulted in more just the loss of the audiotape. Although an <u>incident report</u> is supposed to be filled out by Sheriff's County employees who listen to telephone calls (particularly, one would think, where the alleged call contained admissions to home invasion and shooting a person), <u>no incident report was filled out in this case</u>. (6/54). Thus, not only was Maksim deprived of cross-examination material due to the Commonwealth's failure to preserve the audiotape, he was also deprived of any other written or other material concerning the alleged telephone conversation with which he could attempt to impeach or discredit Officer Orel. See <u>Commonwealth v. Gliniewicz</u>, 398 Mass. 744, 749 (1986) (reversed because destruction of evidence during scientific testing made defense testing impossible; at new trial government was to be prohibited from making use of the tests). Thus, unlike cases where the lost or destroyed evidence was found to be not prejudicial because the defendant had other means to make his or her point to the jury, here Maksim did not stand a chance of impeaching Officer Orel by any other means. Contrast <u>Commonwealth v. Hunter</u>, 426 Mass. 715, 718-719 (1998) (accidentally destroyed fingerprint

(2001) (the "lost evidence doctrine" provides that when potentially exculpatory real evidence is discarded, lost, or destroyed in a criminal case, the defendant may seek to have the charges dismissed, or to prevent the prosecution from relying on that evidence). See also Commonwealth v. White, 47 Mass. App. Ct. at 435 ("In these circumstances, if the case were retried, the government should be precluded from admitting the evidence").

III.  THE CUMULATIVE EFFECT OF THE ERRORS WARRANTS REVERSAL.

For the reasons set forth in Argument I and in Argument II, incorporated herein by reference, if the Court should find that neither of the errors complained of in the two preceding arguments, standing alone, warrant reversal, there can be no question that the two errors complained of in the two preceding arguments, taken together, cannot be said to be harmless. See, e.g., United States v. Sepulveda, 15 F.3d 1161, 1196 (1st Cir. 1993) ("Individual errors, insufficient in themselves to necessitate a new trial, may in the aggregate have a more debilitating effect"). As such, the cumulative effect of the two errors complained of above warrant reversal, where the prejudice resulting from the combination of those two errors clearly cannot be said to be harmless. See, e.g., Commonwealth v. Bassett, 21 Mass. App. Ct. 713, 717 (1993).

December 7, 2004

Respectfully submitted,
Maksim Lutskov,
by his attorney,

Thomas C. Foley,
USDC No. Pending
Attorney at Law
P.O. Box 2187
South Hamilton, MA 01982
(978) 239-7003