UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MAKSIM LUTSKOV,<br>Petitioner. | )<br>)<br>) |
| v. | )  Petitioner's Brief In Support Of<br>)  Petition Under 28 U.S.C. §2254<br>)  For Writ Of Habeas Corpus<br>) |
| LOIS RUSSO,<br>SUPERINTENDENT OF<br>SOUZA-BARONOWSKI<br>CORRECTIONAL CENTER | )<br>)<br>)<br>)<br>) |

Now comes the Petitioner, Maksim Lutskov, and submits this Brief In Support of his Petition Under 28 U.S.C. § 2254 For Writ of Habeas Corpus, as requested by the Court in it's February 15, 2005 Briefing Order.

FACTS[1]

The Commonwealth's Case:

At approximately 9:00 PM on October 31, 1999, after earlier handing out candy to trick-or-treaters, teenager Fulia Aiken was upstairs in her home in Springfield preparing to go to bed when she heard a knock on the door. (4/31-35). Her father, Ahmet, was upstairs sleeping. (5/89-91). Fulia went downstairs, opened the door and found three boys in costume: one was wearing black clothes and wore a black ski mask; another was wearing a "Jason [old fashioned hockey] mask." (4/37). She did not get a good look at the third boy, who was standing near the driveway, because there was something covering his face. (4/37-38)

---

[1] The Record Appendix to the Petitioner's Appellate Brief filed in the Massachusetts Appeals Court shall be cited herein as (R.A. ), citations to the trial transcript shall be cited by transcript volume and page, e.g., (1/10), and where no volume is designated, by date and page, e.g., (Oct.30/10).

1

She put candy in two of the boys' trick-or-treating bags. (4/37). Suddenly the boys forced their way inside the house. (4/39). They grabbed her and pushed her against a wall. (4/39). As she tried to fight them, they demanded to know if anyone was home. (4/39).

Ahmet heard Fulia calling for him, so he rushed downstairs and saw three boys with masks on trying to tie-up his daughter. (5/92-93). The boy in the ski mask had her cornered, and was holding her mouth shut. (4/40, 66). The boy, whom Fulia believed had a Russian accent, was holding a knife. (4/40). The boy taped and taped her hands and her mouth south. (4/41, 66).

When Ahmet, who owned a fruit store and most days would bring home $3,000-$6,000 in cash, came downstairs, the boy with the "Jason mask" pointed a gun at him. (4/41). Another of the boys was holding a baseball bat or a stick. (4/41). When the boys told Ahmet to sit down, he kneeled and asked the boys to leave them alone. (4/42). When Ahmet noticed the boys taping Fulia's hands and mouth, he tried to get up and fight them. (4/42). Fulia next heard three gunshots. (4/42). A lamp shattered and she noticed that her father was bleeding from the face. (4/42).

Ahmet, who was shot once in the arm and once in the stomach, grabbed a frying pan and attacked the boy who had shot him. (5/102). In the ensuing struggle, Ahmet bit one of them on the hand. (5/106). He also knocked the mask off of the face of the boy with the gun. (4/43, 59-60; 5/108, 113). Ahmet was hit from behind in the back and in the head. (5/108).

Fulia described the boy with the gun, whose mask had been knocked off, as white, aged 16-17, with a "red-flecked" or flushed face, strawberry blond or dark blond hair, approximately 6'2", and although she only saw him for 1-2 seconds, she believed he looked Russian. (4/43-44, 57, 74). He was not wearing army fatigues. (4/58). She did not describe any of the boys as wearing gloves on their hands. (4/163).

During the fight after the three gunshots, Ahmet struck the boy wearing the hockey mask several times in the head. (4/45, 165). The boy with the bat hit Fulia in the back of the head. (4/45). The boy with the ski mask who had taped her mouth and hands opened the door, and all three boys ran out of the house. (4/45). Fulia ran after them and took down the license plate of the car. (4/45). She described it as a white car, "boxy" like a Honda Accord, and looked like it was from the early 1990's. (4/68). She noticed that someone may have been waiting in the car for the three boys. (4/69, 119). Ahmet also saw the white car and part of the license plate. (5/118-119).

Fulia went back inside the house and tried to call the police, but the telephone wire had been cut. (4/46, 64). That night she went to the police station and looked at photos, but she did not see any photos that resembled the boy whose mask had been knocked off. (4/49, 60-61). A few weeks later she looked at a book of photos of Russian males, but although she was "100% sure" that the attackers were Russian, she never picked out the boy whose mask was knocked off. (1/67). She also did not identify the defendant, Maksim Lutskov, despite being shown his photograph. (4/169-170). Neither Fulia nor Ahmet were able to make an in-court identification of Maksim as one of their attackers.

Officers Thomas Sheehan and Gregory Bigda responded to the Aiken's home on Halloween. (4/75, 125-126). They testified that although Fulia had been confident that she could identify the boy whose mask fell off, after looking at a folder of photos of Russian males, she was unable to identify the boy. (4/106-107, 112-113; 5/169-170). While at the house they found a roll of blue and a roll of gray duct tape. (4/89, 130). They also found a live .32 caliber bullet, as well as two other projectiles. (4/155). State Trooper John Schrijn of the firearms identification section determined that the spent projectiles recovered at the Aiken's house were .32 caliber. (6/77, 87-89). He testified that the gun they were fired from was most likely a handgun. (6/93).

3

The police dusted for fingerprints and recovered two usable prints off of the hockey mask. (4/131). No other fingerprints were usable. (4/140). Analysis revealed that a print lifted from the hockey mask was Maksim's. (5/168).

The officers later investigated the source of the blue duct tape, which was "unique" tape, and found that only one place in Western Massachusetts used it: Edrom Corporation in Holyoke. (4/135-136). Edron kept this special tape under lock and key because it was very expensive. (4/137). After looking at a list of Edron's employees who spoke either Russian or Polish, they focused their investigation on employee Ivan Koba, who had a son named Alexi Koba ("Koba"). (4/138-139). The license plate of Koba's green Acura Integra was similar to the plate given by Fulia. (4/149-150).

Koba gave a statement to police during a six-hour interrogation on November 5, 2000. (4/145). The police told him that they had his fingerprints (which was not true). (4/212). Koba, who was 19 years old at the time, started shaking, and then suggested that he was willing to cooperate with the police. (4/180).

Koba testified that he had known Maksim and Artem for about one year prior to the incident. (5/214). He claimed that he was not friends with Maksim – they had had "difficulties" prior to the incident; but he also claimed that he had met with Maksim almost every day for an entire year leading up the incident. (5/5-7). He almost had a fight with Maksim a few days before the fight, and admitted that bitter feelings remained between them. (5/23-24).

Koba testified that sometime before Halloween he had met with Artem and Maksim at a chiropractor's office in Springfield. (5/215). The purpose of the meeting had been for Artem and Maksim to ask him if he wanted to make any money breaking into the house of a Turkish drug dealer. (5/26). He claimed that Artem and Maksim had been planning the break-in for a year, but they never told him what their plans were before that day. (5/8). Artem and Maksim told Koba

4

that a carpenter had learned that the Turk's safe contained half a million dollars. (4/217; 5/25-26). The money was supposed to be illegal, and was supposed to be taken to Turkey once a year. (529). The Turk was supposed to be a "Boss." (5/30).

Koba testified that Maksim once drove by his house to show him a gun. (4/218). He also explained that he was with Maksim and Artem when they bought Halloween bags from a Halloween store in East Longmeadow. (4/219-220). He also went with them to a Target store in the Holyoke Mall where they bought two white masks and a "Scream" costume, which included a black cloak. (4/220). They did not use the Scream mask in the robbery. (4/221).

On Halloween, they met at 7:00 at Artem's house, then went to Maksim's house, where they briefly saw Alex Arkhipova, who lived there as well. (4/222-223). They got dressed, with Maksim wearing green army camouflage pants. (4/223). Koba drove them to the Aiken's house and parked on the street. (2/224). They knocked at the door but no one answered. (4/224). They went back to the car, looked around, then returned to the door, knocked again, and this time the girl answered. (4/224). All three of them had sticks. (5/51). Maksim had a small gun, and Artem had a six-inch knife. (5/51-52). Koba and Maksim were on the stoop, and Artem was down below. (4/225).

Koba testified that after the girl put candy in their bags, Koba – whose job was to tie-up the occupants - forced his way inside. (4/226; 5/14). They were telling the girl to shut up when the Turkish man came downstairs as Artem disabled the telephones. (4/226-227). Maksim pointed his gun at the Turkish man and told him to get on the floor. (4/227). The Turkish man pointed at a drawer and said that was where the money was. (4/228). When Artem came back into the room, the Turkish man grabbed him, so Maksim stepped in and they all started fighting. (4/228). Mr. Aiken was hitting them, but Maksim pulled him off. (4/229). While Maksim had been wrestling, his mask fell off. (4/230). Maksim said, "Don't come toward me or I'm going to

5

shoot you," but when Mr. Aiken continued to come towards him, Koba heard three shots. (4/229). He could not see if the man had been hit, but he could see that the man was bleeding. (4/230).

Koba testified that the Turkish man grabbed a pot and held it in the air as he demanded they leave his house, causing them to all leave, and they drove away in Koba's 1993 Mazda Protege. (4/232; 5/57). Koba left his stick in the house. (4/231). They had been in the house for 15-20 minutes. (4/233).

They went back to Alex Arkhipova's house, changed clothes, put everything in a bag and dropped all of the clothes at the end of a dead end street in Springfield. (4/233). Koba never saw the gun again. (4/234).

One year later the police called, so Koba went to the station, was read his Miranda rights, and after he was told that he could be imprisoned 20 years and might be deported, and after the police told him they had his fingerprints (which was not true), he gave the police a statement. (4/17, 238). No promises were made to him, but he was told that his cooperation would be taken into consideration. (4/238). He met with the Assistant District Attorney and an attorney. (4/238). They drafted a "cooperation agreement," which he signed along with his attorney. (4/245). The agreement did not contain any specific offers. (4/245). He did not expect to walk away from the charges because of his cooperation. (4/247).

Detective Donald Brown of the Springfield police department, who testified (for no particular reason) that he had experience working with "gang members," interrogated Maksim at the Springfield police department on November 13, 2000. (5/140-141, 174). After Miranda rights had been read and Maksim signed a Miranda warnings sheet, Maksim indicated a willingness to talk. (5/183, 187). Maksim had been brought up from his cell (5/215), signed and initialed the Miranda warnings sheet (5/217-218), and when asked if he wanted to speak, he asked

6

me the names of these friends so that I can locate them, . . ." (5/222-223). The prosecutor then asked whether the report "goes on from there and he said that he didn't wish to tell me who he was with," to which the detective answered in the affirmative. (5/223).

In January or February of 2001, a request was made by the District Attorney's office to monitor Maksim's calls at the Hampden County House of Corrections. (6/43). Correctional Officer Grigoriy Orel, whose native language was Russian, acted as interpreter. (6/44, 109-110). While listening to a conversation between Maksim and his mother, Officer Orel heard Maksim's mother ask, "Why are you in jail. (6/112, 117, 153, 156). Maksim responded, "I killed a fucking guy. . . . I shoot him . . . . I never be [sic] shot him if he didn't hit me with the pan." (6/156). His mother said, "No, no, you didn't do it," but he replied, "No, I did. I shot him several times." (6/156). His mother said, "You didn't kill him," and Maksim replied, "The next time he'll get more, he deserve more." (6/156). Although the telephone conversation was tape recorded, neither the correctional officers nor the Assistant District Attorney, who was present during the telephone call, made the proper arrangements to save the audiotape. (6/47-67). Therefore, the tape was taped over several months later, before trial, and before the defense had an opportunity to listen to it, or even knew of its existence. (6/47-67).

## LEGAL ARGUMENT

I.  THE ADMISSION INTO EVIDENCE OF MAKSIM'S DECISION NOT TO ANSWER THE DETECTIVE'S QUESTION CONCERNING WHO HE WAS WITH AT SIX FLAGS ON THE DAY OF THE INCIDENT VIOLATED HIS RIGHTS UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

The admission into evidence of Maksim's decision not to answer the detective's question concerning who he was with at Six Flags on the day of the incident violated his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution. See Doyle v. Ohio, 426 U.S. 610 (1976); Miranda v. Arizona, 384 U.S. 436 (1966).

8

A defendant's silence after the police have given the warnings mandated by Miranda v. Arizona, 384 U.S. at 467-479, may not be used against that defendant. . . . [T]o do so would 'penalize' the invocation of the right to silence." Commonwealth v. Waite, 422 Mass. 792, 797 (1996), citing Doyle v. Ohio, 426 U.S. at 618. "The right to the advice of counsel would be of little value if the price for its exercise is the risk of an inference of guilt." Commonwealth v. Person, 400 Mass. 136, 141 (1987), quoting Commonwealth v. Burke, 339 Mass. 521, 533 (1959), rev'd on other grounds, Commonwealth v. Beldotti, 409 Mass. 553 (1991). Indeed, the Supreme Court said in Doyle v. Ohio, 426 U.S. at 618, that, "while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings."

In this case, there is no question that such evidence was "used as evidence of guilt." Commonwealth v. Cobb, 374 Mass. 514, 521 (1978). Detective Donald Brown of the Springfield police department, who testified (for no particular reason) that he had experience working with "gang members," interrogated Maksim at the Springfield police department on November 13, 2000. (5/140-141, 174). After Miranda rights had been read and Maksim signed a "Miranda Warnings" form, Maksim indicated a willingness to talk. (5/183, 187). Maksim, who had been brought up from his cell (5/215), signed and initialed the Miranda Warnings sheet (5/217-218). Maksim then denied any involvement in the home invasion, and explained that he had been at the Six Flags amusement park with some friends on the day in question. (5/184).

Next during this direct examination by the prosecutor, Detective Brown testified that when he asked Maksim the names of those friends, Maksim would not provide those names to him. (5/184). Detective Brown testified that "[a]fter initially denying [involvement], his response was that he was at Six Flags amusement Park with some friends." (5/184). But when asked if Maksim had been asked to reveal the names of those friends, Detective Brown testified that

9

Maksim would not give them the names of his friends. (5/184). To make matters even worse, the Miranda Warnings form was entered into evidence by the prosecutor, containing the following notation handwritten by the detective: "Stated was at Six Flags with friends. Wouldn't give names of friends." (R.A. 19; 5/183, 208).

As this testimony makes clear, there can be no question that Detective Brown's testimony, given in response to the prosecutor's questioning on direct examination, and the admission into evidence of the detective's notation on the Miranda Warnings form signed by Maksim, violated Maksim's Constitutional rights. See, e.g., Commonwealth v. Cobb, 374 Mass. 514, 521 (1978) (evidence of defendant's post-Miranda statement, "What can I say?," deemed exercise of intention to remain silent, improperly introduced during Commonwealth's case-in-chief). See also Commonwealth v. DePace, 433 Mass. at 381 (detectives testified that the defendant wrote, "I want to talk to my attorney" on the Miranda rights form signed by the defendant, and that form was admitted as an exhibit).

On cross-examination, when the defense attorney asked, "And Mr. Lutskov said he didn't want to tell him who he was with?" Detective Brown replied, "That's correct. Yes." (5/203). Detective Brown further testified on cross-examination that, "I believe [Maksim] answered a few questions. I don't think he exactly said he was willing to speak with us." (5/205). Detective Brown also testified on cross-examination that although Maksim had been interrogated for 30 minutes, the only thing written down by the police on the Miranda Warnings form was "I was at Six Flags with friends," and then Maksim refused to give the names of those friends. (5/208).

On redirect, the prosecutor could not let this issue alone. The prosecutor, reading from a police report not entered into evidence,[3] asked whether the police report of the interrogation

---

[3] The police report, marked as Exhibit 2 for Identification, states in pertinent part: "I then asked that he tell me the names of these friends. . . . He told me then that he didn't wish to tell me whom he was with." (R.A. 19; 5/226).

stated, "'I then asked him to tell me the names of these friends so that I can locate them,' and it goes on from there and he said that he didn't wish to tell me who he was with. . . .," to which the detective responded, "That's correct." (5/222-223). Once again, there can be no doubt that Maksim's Constitutional rights were violated by Detective Brown's comments on Maksim's decision to remain silent.[4]  See Doyle v. Ohio, 426 U.S. at 619, (evidence of post-arrest silence used for the substantive purpose of permitting an inference of guilt or to impeach an exculpatory story violates the due process clause of the Fourteenth Amendment).  See also Commonwealth v. Brum, 438 Mass. 103, 119 (2002) (improper where two detectives "testified concerning the defendant's first statement to the police, and both related that, after giving his own narrative and answering a couple more specific questions, the defendant stated that he did not want to answer any more questions").  As such, Maksim is entitled to a new, and fair trial, where evidence that he exercised his right to remain silent will not be used against him.  See Commonwealth v. Mahdi, 388 Mass. at 698, ("The weight of the evidence alone is not sufficient, however, to make the district attorney's comments harmless error.  The nature of a Doyle error is so egregious that reversal is the norm, not the exception").

II.   THE COMMONWEALTH'S LOSS AND DESTRUCTION OF THE AUDIOTAPE OF THE TELEPHONE CONVERSATION BETWEEN MAKSIM AND HIS MOTHER VIOLATED MAKSIM'S DUE PROCESS RIGHT TO A FAIR TRIAL AS GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

---

[4] At a sidebar, the prosecutor explained: "Now, if we wanted to get into a whole legal battle, he basically asserts his rights thereafter and clearly we don't want to get into that issue, so he indicated he did not wish to give a witness statement but he did talk to the officers. They asked him – they told him they wanted to talk to him about October 31, 1999. He told them I was at Six Flags with friends. When they asked him who were you with, he refused to tell them. They asked him another question, and he blared up." (5/179). Later at the same sidebar, the prosecutor explained: "They Mirandized him, he made an oral statement, they had wrote it down, he did not wish to talk with them at that point. He tells them he wished – I don't know exactly what words he used, but basically he told them he wasn't interested in speaking to them." (5/181).

The Commonwealth's loss and destruction of the audiotape of the alleged telephone conversation between Maksim and his mother violated his due process rights under the Fifth and Fourteenth Amendments of the United States Constitution. See Arizona v. Youngblood, 488 U.S. 51 (1988).

A.  The Evidence Was Potentially Exculpatory.

Because the Commonwealth did not preserve the tape, there is no way to know for certain what the tape would have revealed. "Where evidence is lost or destroyed, it may be difficult to determine the precise nature of the evidence." Commonwealth v. Neal, 392 Mass. at 12. However, it is well settled that the defendant "need not show conclusively the exculpatory nature of the destroyed evidence." Commonwealth v. Sasville, 35 Mass. App. Ct. 19, 20 (1993). In this case, while it is indeed difficult to determine the precise nature of the lost audiotape of the telephone conversation between Maksim and his mother (assuming there was, in fact, a conversation at all), there can be no genuine dispute that there is a real possibility that the tape would have included valuable exculpatory material. Despite Officer Orel's testimony that Maksim admitted to shooting the owner of the house (Ahmet), the tape could have proved that Officer Orel's translation of the call (which took place in Russian), was not correct; that anything inculpatory that Maksim might have been sarcastic, or said in jest (Officer Orel testified that Maksim laughed after making an inculpatory statement; had the jury been able to hear the laugh, it could have determined whether Maksim laughed because he was being sarcastic or jesting, or because (as the Commonwealth suggested) he was so callous that he thought it was funny that he had shot a man); that the call never took place at all; that Officer Orel did not remember the conversation correctly; that Officer Orel's testimony exaggerated the words used or the definitiveness of the alleged admission; that the voice on the telephone was not Maksim's; that the Officer did not hear the entire conversation, or was only relaying part of the conversation and

12

took portions of it out of context, or any number of things that would have aided Maksim's defense.

While the Commonwealth will no doubt fall back on a claim that Maksim was provided with a full and fair opportunity to cross-examine Officer Orel, the simple truth is that without the tape there was absolutely no way to discredit or impeach Officer Orel, or to raise the issues listed in the preceding paragraph, because Officer Orel could simply, as he did, stand by his assertion that he heard the conversation clearly and remembered it well, knowing that the defense could not possibly impeach him.

However, had the Commonwealth provided the tape to the defense, as it should have done, there is a very real possibility that the tape would have contained evidence to discredit and impeach Officer Orel's version of the alleged conversation. See, e.g., Stuart v. State, 907 P.2d 783, 816 (Idaho 1995) (destroyed jail telephone logs would have had "exculpatory value" in prisoner's prosecution for murder by torture). In these circumstances, had the Commonwealth not lost and destroyed the tape recording of the alleged conversation, there is a very real probability that it would have contained information helpful to the defense's attempts to limit the substantial damage done by Officer Orel's testimony. As such, it certainly would have aided Maksim's case, and therefore there is a real possibility that the evidence would have contained exculpatory material. See United States v. Bryant, 439 F.2d 642, 648 (D.C. Cir. 1971). See also Commonwealth v. Sasville, 35 Mass. App. Ct. at 25 ("In any event, negative paternity tests would, without question, have been a real factor in the jury deliberations").

    B. <u>The Commonwealth Was Highly Culpable For The Loss and Destruction of the Alleged Audiotape.</u>

In this case, there can be no question that the Commonwealth was, at the very least, grossly negligent, and therefore certainly highly culpable for the loss and destruction of the audio-

13

taped conversation. See Commonwealth v. Kater, 432 Mass. 404, 417-418 (2000) (state is "culpable" for loss or destruction of evidence if the evidence has been lost or destroyed through its negligence or inadvertence). In January or February of 2001, a request was made by Assistant District Attorney Donna S. Donato (the trial prosecutor) of the Hampden County District Attorney's Office, to monitor Maksim's calls. (6/43). Officers such as Officer Kenney routinely monitor calls for the District Attorney's office, and Correctional Officers from time to time – at a prosecutor's request - monitor or record telephone calls made by inmates. (6/42).

On a request by the prosecutor, in January or February 2001, Correctional Officer Gregoriy Orel was assigned by Officer John Kenney, the Deputy Chief of Security at the Hampden County House of Correction, to monitor Maksim's calls and to act as an interpreter (as Maksim and his mother spoke Russian). (Oct. 30/60-61; 6/44, 66-67). The proper procedure for a prosecutor to preserve the audiotape of an inmate's telephone call is to serve a subpoena on Officer Kenney's office specifically designating the tape to be saved. (Oct. 30/4-6; 6/58).

However, the prosecutor did not timely serve a subpoena; rather, the prosecutor did nothing more than leave a handwritten note on John Kenney's desk sometime after the telephone call was monitored, requesting Officer Kenney to save the tape of the telephone call. (6/47, 57). Over the course of the next four to five months, the prosecutor and Officer Kenney had conversations between the time he received her note and the time he got the subpoena. (6/48). However, inexplicably, not until May 2001 (four to five months after the telephone call was monitored) did the prosecutor serve Officer Kenney with a subpoena to preserve and turn over a tape of the monitored telephone call.[5] (6/47, 58). Of course, by now it was too late; Officer

---

[5] During the hearing on the Motion in Limine, the prosecutor admitted that "I left [Officer Kenney] a note indicating that I would be interested in certain recordings that were made, and I would send him a subpoena to that effect," (Oct.30/28), but she did not serve the subpoena until over four months later - after the tape had been taped over. (6/48; 47, 58, 60-63).

Kenney was now unable to provide recordings because the digital tapes had been re-used (i.e. taped over) in the usual course.[6] (6/48, 60-63). Officer Kenney specifically testified that he did not have the tapes made after he received the prosecutor's handwritten note because the proper procedure to trigger the preservation of the tapes was for a prosecutor to serve a subpoena, which the prosecutor did not do until May 2001 (4 to 5 months after the call) – after the tape had been taped over in the regular course. (6/58).

As these undisputed facts make clear, there can be no question that the Commonwealth was responsible for the loss and destruction of the audiotaped conversation, as it did not follow the proper procedure (serving a subpoena) to preserve the tape, and instead did nothing more for the next four to five months than simply leave a handwritten note on Officer Kenney's desk telling him that a subpoena would be served at some future time. This sloppy conduct cannot be said to even rise to the level of a diligent or earnest effort to preserve the tape. See, e.g. People v. Kelly, 467 N.E.2d 498, 500 (N.Y. 1994) ("Where discoverable evidence gathered by the prosecution or its agent is lost, the People have a heavy burden of establishing that diligent, good-faith efforts were made to prevent the loss"), and State v. Bailey, 144 Vt. 86, 94-95 (1984) ("[T]he government should be held to the standard of showing 'earnest efforts' to preserve crucial materials"), both cases cited with approval in Commonwealth v. Willie, 400 Mass. at 432 & 435 (1987) (Liacos, J., concurring in part, dissenting in part).

As even the prosecutor suggested (Oct.30/31), it was the prosecutor's negligence (at the very least) that caused the loss and destruction of the alleged telephone call between Maksim and his mother. Thus, it cannot be fairly disputed that the Commonwealth was culpable. See

---

[6] A call can be preserved permanently only by pulling the digital tape and making a standard tape cassette recording of it. (Oct. 30/69-72; 6/41). However, once it is dumped from the digital audiotapes (as it was in this case due to the prosecutor's failure to timely serve a subpoena), it is lost forever. (Oct. 30/69-72, 78-79; 6/41).

Commonwealth v. Garrey, 436 Mass. 422, 442 n.12 (2002) (prosecutor has an affirmative obligation diligently to search for and preserve materials that are discoverable in every criminal case; a lackadaisical attitude with regard to this responsibility is unacceptable in any criminal prosecution, and most emphatically so in a prosecution of murder). That is particularly so where Officers Kenney and Orel were acting as agents for the prosecutor as they helped her intercept and translate the alleged telephone call, and as such the prosecutor had, at the very least, constructive possession of the audiotape. See, e.g., Commonwealth v. Sasville, 35 Mass. App. Ct. at 20 (where Commonwealth instructed physician that blood tests on a fetus would not be necessary, causing physician to dispose of fetus, Court concluded that the Commonwealth had constructive control over the fetus, and was therefore culpable for its destruction). See also Commonwealth v. Woodward, 427 Mass. 659, 679 (1998).

C. Materiality.

"Undisclosed exculpatory evidence is 'material' if, 'evaluated in the context of the entire record,' it 'creates a reasonable doubt that did not otherwise exist.'" Commonwealth v. Gregory, , 401 Mass. at 442, quoting United States v. Agurs, 427 U.S. 97, 112, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). However, "[w]hen the evidence no longer exists and the defendant has made a specific request for it, the defendant need only show a reasonable possibility that the evidence was exculpatory." Commonwealth v. White, 47 Mass. App. Ct. 430, 433 (1999)), citing Sasville, 35 Mass. App. Ct. at 26, n.11.

In this case, although Maksim did not make a specific request, a specific request would have been "fruitless." See, e.g., Commonwealth v. Neal, 392 Mass. at 12 ("[I]n this case a specific request would have been fruitless given that the ampules were routinely discarded after the defendant's breathalyzer test"). Where the defense had no opportunity to make a specific

request because the Commonwealth lost the evidence <u>before</u> the defense ever knew it existed, and because the evidence is something that the defense obviously <u>would have specifically requested</u> (as opposed to a simple general <u>Brady</u> request) had it known of its existence, fairness and, indeed, due process, requires that this case be judged on the lesser standard used where a specific request has been made. See, e.g., <u>Commonwealth v. Sasville</u>, 35 Mass. App. Ct. at 26, n.11 ("Here, the evidence was destroyed before the defendant knew of its existence, and, therefore, there was no specific request"). See also <u>Commonwealth v. Neal</u>, 392 Mass. at 11 n.10 ("Distinctions have been drawn between the standard of materiality to be applied where the prosecution fails to supply evidence specifically requested by the defendant, and the standard in cases where no request or only a general request for <u>Brady</u> evidence has been made").

In any case, under either test, there can be no doubt that the lost audiotape conversation was "material" to Maksim's defense, as it would have affected the outcome of the trial, and certainly would have, at the very least, been a real factor in the jury's deliberations. See <u>Commonwealth v. Sasville</u>, 35 Mass. App. Ct. at 26 n.11 (if defendant made a specific request for undisclosed exculpatory evidence, new trial is required if the undisclosed evidence might have affected outcome of the trial; if no request or only a general request was made, test is whether the undisclosed evidence would have been a real factor in jury's deliberations).

As argued above, if the Commonwealth had not lost the audiotaped conversation, an examination of the tape probably would have produced evidence helpful to the defense to defuse or, very likely, completely discredit Officer Orel's damaging testimony. Without the audiotape, there was simply <u>no way</u> for the defense to cast any doubt on Officer Orel's insistence that Maksim had admitted that he shot Ahmet Aiken, and that far from showing any remorse, he seemed to brag about it. This evidence was so damaging that any assistance the tape could have

17

provided to the defense would not only be "material," it would be invaluable. Thus, in these circumstances, there can be little doubt that the lost or destroyed evidence was <u>highly material</u>. See Commonwealth v. Harwood, 432 Mass. 290, 296 (2000); Commonwealth v. Woodward, 427 Mass. at 680; Commonwealth v. Phoenix, 409 Mass. 408, 414 (1991) ("Evidence of the alleged bullet hole was material to the defendant's case because of the Commonwealth's theory that the defendant constructed a homemade silencer. The hole could have been material evidence of how the murder weapon was used").

    C.    <u>The Loss And Destruction Of The Rape Kit Prejudiced The Defendant's Cause</u>.

The Commonwealth's loss of the audiotape effectively assured that Officer Orel's testimony would go to the jury unchallenged. See, e.g., Commonwealth v. Sasville, 35 Mass. App. Ct. at 27 (where Commonwealth's loss of evidence effectively precluded defendant from cross-examining key witness, the absence of the lost evidence created a strong possibility of prejudice). Officer Orel was certainly a key witness, and his testimony was extremely powerful, as it essentially amounted to an admission by Maksim that he was involved in the home invasion and that he himself had shot Ahmet Aiken – and felt no remorse for doing so.

Officer Orel testified that while listening to a conversation between Maksim and his mother, he heard Maksim's mother ask, "Why are you in jail." (6/112, 117, 153, 156). Maksim responded, "I killed a fucking guy. . . .I shoot him. . . . I never be [sic] shot him if he didn't hit me with the pan." (6/156). His mother said, "No, no, you didn't do it," but he replied, "No, I did. I shot him several times." (6/156). His mother said, "You didn't kill him," and Maksim replied, "The next time he'll get more, he deserve more." (6/156).

This extremely damaging testimony went essentially unchallenged. That is because, although the telephone conversation was tape-recorded, neither the correctional officers nor the Assistant District Attorney, <u>who was present during the telephone call</u>, made the proper

18

arrangements to save the tape. (6/47-67). The Commonwealth's failure, of course, did not penalize the Commonwealth at all, as it had the benefit of Officer Orel's extremely damaging testimony. Rather, only Maksim was prejudiced, because without the tape he had no way to cross-examine Officer Orel. Had the tape been turned over to the defense, as it should have been, the tape would have provided invaluable information to cross-examine Officer Orel, as set forth above.

Finally, the Commonwealth and its agent's sloppy (at best) work resulted in more just the loss of the audiotape. Although an incident report is supposed to be filled out by Sheriff's County employees who listen to telephone calls (particularly, one would think, where the alleged call contained admissions to home invasion and shooting a person), no incident report was filled out in this case. (6/54). Thus, not only was Maksim deprived of cross-examination material due to the Commonwealth's failure to preserve the audiotape, he was also deprived of any other written or other material concerning the alleged telephone conversation with which he could attempt to impeach or discredit Officer Orel. See Commonwealth v. Gliniewicz, 398 Mass. 744, 749 (1986). Thus, unlike cases where the lost or destroyed evidence was found to be not prejudicial because the defendant had other means to make his or her point to the jury, here Maksim did not stand a chance of impeaching Officer Orel by any other means. Contrast Commonwealth v. Hunter, 426 Mass. 715, 718-719 (1998). In fact, the defense was not even provided with a reasonable advance explanation for the words allegedly used by Maksim during the alleged call until Officer Orel testified at trial. (Oct. 30/34-35; 6/140-142).

Thus, it is clear that while the audiotape would have provided Maksim with invaluable evidence to rebut the extremely damaging testimony by officer Orel, the absence of the audiotape virtually precluded Maksim from mounting a defense to the damaging impact of Officer Orel's testimony, because he was left with no way to attack that testimony. See Commonwealth v.

19

CERTIFICATE OF SERVICE

I, Thomas C. Foley, hereby certify that true copies of the Petitioner's Brief In Support Of Petition For Writ Of Habeas Corpus were served on the following counsel by U.S. mail on February 25, 2005:

Maura D. McLaughlin
Assistant Attorney General
Office of the Attorney General
One Ashburton Place
Boston, MA 02108-1598

_____
Thomas C. Foley