UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MAKSIM LUTSKOV, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action No. 04-12601-PBS |
| | ) | |
| LOIS RUSSO, | ) | |
| | ) | |
| Respondent. | ) | |

**RESPONDENT'S MEMORANDUM OF LAW
IN OPPOSITION TO PETITIONER'S PETITION FOR
WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254**

The respondent hereby submits this memorandum in opposition to the petition for writ of habeas corpus filed by Maksim Lutskov ("the petitioner"). As set forth below, the petition pursuant to 28 U.S.C. § 2254 should be denied where the Massachusetts Appeals Court's decision resolving the petitioner's claims against him was neither contrary to, nor an unreasonable application of, clearly established federal law, as determined by the Supreme Court.

**STATEMENT OF THE CASE**

On December 27, 2000, a Hampden County grand jury returned indictments alleging that on October 31, 1999, the petitioner, a youthful offender, committed the following crimes: home invasion in violation of M.G.L. ch. 265, § 18C; assault and battery with a dangerous weapon (a gun); assault and battery with a dangerous weapon (a stick or unknown wooden object); assault and battery with a dangerous weapon (a gun) with intent to rob; assault with a dangerous weapon (a knife); and assault and battery. *See* Record Appendix, reproduced in the respondent's

Supplemental Answer (hereinafter, "Supp. Ans.") at Exhibit 4, pp. 5-10 (Indictments Nos. FIY01S0556-0561).

Prior to trial, the trial judge conducted an evidentiary hearing on dueling motions in limine. *See* Findings of Fact and Rulings of Law on Motion in Limine, Supp. Ans., Ex. 3. The petitioner sought to exclude, and the Commonwealth sought to introduce, a jailhouse telephone statement the petitioner had made to his mother due to the Commonwealth's loss of the audio recording of the statement. *See id.* (The statement was "He [sic] lucky I didn't kill him after he hit me with that pan." Supp. Ans., Ex. 5, p. 1.) The judge allowed the Commonwealth's motion, and made written findings of fact and conclusions of law, in which he held that although the Commonwealth was negligent in not preserving the conversation, "[t]here was insufficient evidence by the [petitioner] that the [conversation] would be exculpatory;" that "[t]here is no evidence in considering the entire record that the evidence would create a reasonable doubt as to the [petitioner's] guilt;" and [t]here is no substantial prejudice to the [petitioner]." Supp. Ans., Ex. 3, p. 3.

On November 15, 2001, after a trial in the Massachusetts Superior Court (Dunbar, J., presiding), a jury found the petitioner to be a youthful offender on all charges. On January 4, 2002, Justice Dunbar found that the petitioner was not capable of rehabilitation within the juvenile justice system and was unlikely to avoid future criminal conduct. *See* Record Appendix, pp. 24-25, Supp. Ans., Exhibit 4. Justice Dunbar therefore sentenced the petitioner to twenty years to twenty years and one day at the Massachusetts Correctional Institute at Cedar Junction ("MCI-Cedar Junction") on the charge of home invasion; nine to ten years from and after the sentence on the home invasion charge, suspended with probation for ten years, on the

charge of assault and battery with a dangerous weapon (hereinafter, "ABDW") with a handgun[1]; nine to ten years concurrent with the sentence imposed on the home invasion charge for the charge of ABDW with a stick or wooden object; ten to twenty years at concurrent with the sentence imposed on the home invasion charge for the charge of assault with intent to rob; three to five years concurrent with the sentence imposed on the home invasion charge for the charge of ABDW with a knife; and two to two and one-half years concurrent with his other sentences for the charge of assault and battery.

The petitioner filed a notice of appeal of January 16, 2002, and the appeal was docketed on October 15, 2002.  On February 5, 2004, the Massachusetts Appeals Court issued an order denying the petitioner's appeal.  *Commonwealth v. Lutskov*, 60 Mass.App.Ct. 1115 (2004)(table),  Supp. Ans., Ex. 7.  The petitioner filed an Application for Further Appellate Review with the Massachusetts Supreme Judicial Court ("the SJC"), but this application was denied by the SJC on March 31, 2004.  *See* Supp. Ans., Exs. 8, 9.

The instant habeas petition was filed on or about December 9, 2004.

## STATEMENT OF FACTS

A state court's determination of facts is entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1).  *See Coombs v. Maine*, 202 F.3d 14, 18 (1st Cir. 2000); *Avellar v. DuBois*, 30 F.Supp.2d 76, 79 (D.Mass. 1998); *Otsuki v. DuBois*, 994 F.Supp. 48, 51 & n.3 (D.Mass. 1998); *cf. Sumner v. Mata*, 449 U.S. 539, 545-46 (holding that the presumption of correctness under former habeas statute applied to "factual determinations made by state courts, whether the

---

[1] All of the sentences imposed by the judge in the petitioner's criminal case were to be served at MCI-Cedar Junction.

court be a trial court or appellate court"), 101 S.Ct. 764, 66 L.Ed.2d 722 (1981). A reviewing habeas court reviews the facts "in the light most favorable to the jury's verdict, consistent with record support." *United States v. Gonzalez-Vasquez*, 219 F.3d 37, 40 (1st Cir. 2000). This deference extends to inferences drawn by the state court from those factual determinations as well. *See Parke v. Raley*, 506 U.S. 20, 35, 113 S.Ct. 517, 121 L.Ed.2d 391 (1992); *Flores v. Marshall*, 53 F.Supp.2d 509, 514 (D.Mass. 1999). A petitioner seeking to overturn a state court's factual determination has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

I.  Facts Regarding Crimes of Which the Petitioner Was Convicted[2]

This underlying criminal case arose out of an armed home invasion on Halloween night, 1999. Three young men, dressed as trick-or-treaters, forced their way past eighteen-year-old Fulia Aiken (who had opened the door to them) and into her home as part of a pre-conceived robbery attempt. Before the trio left the home, Fulia's father, Ahmet Aiken, had been shot three times. The investigation of the crime lay dormant for a year until police work resulted in the arrests of the culprits.

For a year, the petitioner and his friend, Artem Vaskanian, had been planning to rob Ahmet Aiken, whom they had heard kept large amounts of cash at his home. (Tr. IV/216-17; V/7, 18, 25, 29). About a week before Halloween, the two involved their friend, Alexi Koba into the venture. (Tr. IV/215-18).

According to the plan, the robbery would take place on Halloween night, a Sunday. (Tr.

---

[2] This facts contained in this section are drawn from the Brief for the Commonwealth on Appeal, *Commonwealth v. Maksim Lutskov*, A.C. No. 2002-P-1374, Supp. Ans., Ex. 5.

4

IV/217). Each participant had a role to play: Koba was to tie up the victims, Vaskanian was to cut the telephone lines from inside the house; and the petitioner would carry the gun. (Tr. IV/217-18; V/13-14, 53). In the days leading up to Halloween, the three made their final preparations. They drove by the Aiken's house once, and the petitioner and Vaskanian directed Koba's attention to it. (Tr. IV/218). The three also rode in Koba's car to a party store in the nearby town of East Longmeadow, where they bought trick-or-treat bags, and to a store in the Holyoke Mall at which they purchased two "Jason" masks, a black ski mask, and a "Scream" costume.[3]

On Halloween, Ahmet Aiken and his daughter Fulia were at home. Ahmet went to bed at about 8:30 p.m. (Tr. IV/35; V/91). After her father had gone to bed, Fulia heard banging on the side door of the house. (Tr. IV/35). She did not want to answer the door because it was late in the evening. (Tr. IV/35). When the banging persisted, however, she went downstairs and opened the door. (Tr. IV/35-36, 224). The petitioner, wearing the "Jason" mask and hiding a gun, stood on the outside step. (Tr. IV/37, 225-26). Beside him stood Koba, who wore the black ski mask and had a stick beneath his costume cloak. (*Id.*) Vaskanian, also dressed as "Jason" and carrying a knife, stood back near the driveway. (Tr. IV/37-38, 225; V/52).

Fulia put candy in the petitioner's and Koba's trick-or-treat bags. (Tr. IV/37, 226). They then forced their way into the house, pushing Fulia up against the wall. (Tr. IV/38-39, 226).

---

[3] A "Jason" mask, worn by "the character "Jason" in the movie 'Friday the Thirteenth,'" *State v. Carter*, 779 So.2d 125, 132 n.1 (La. App. 2001), is a "hard plastic face mask typically worn to play hockey." *Commonwealth v. Spencer,* 45 Mass.App.Ct. 33, 34 n.2 (1998). The "Scream" costume, also drawn from a movie, is comprised of a mask (derived from the 1893 Edvard Munch painting known as "The Scream") and a dark cloak. (Tr. IV/220-21; *see also* www.ibiblio.org/wm/paint/auth/munch).

Vaskanian went into the living room to cut the phone lines. (Tr. IV/46-48, 65, 227; V/53-55). Fulia, kicking and screaming, fought her attackers. (Tr. IV/40, 226). They told her to shut up. (Tr. IV/40, 226). She noted their Russian accents. (Tr. IV/39-40).s Koba dropped his stick and tried to tape the girl's hands. (Tr. IV/40).

From his bedroom, Ahmet heard his daughter calling for him. (Tr. V/92). Ahmet ran downstairs and saw the three masked intruders trying to tie up his daughter. (Tr. IV/40, 226-27; V/92-93). The petitioner rushed over to Ahmet, pointed the gun at him, ordered him to sit down, and demanded to know the location of the safe. (Tr. IV/40-41, 226-28). Ahmet complied with the petitioner's demands, and indicated a drawer which contained money. (Tr. IV/227-28; V/94). Ahmet detected a Russian or Polish accent in the petitioner's speech. (Tr./IV42; V/94-95, 99).

Koba and Vaskanian, armed with a knife, taped up the hands of Fulia, who still struggled furiously. (Tr. IV/41-42, 227; V/95, 100). They then began to tape her mouth. (Tr. IV/42). At that point, Ahmet grabbed a frying pan from the stove and counter-attacked. (Tr. IV/42, 228-29; V/100-02). The petitioner shot Ahmet three times: one bullet in his arm; one in his stomach; and a bullet which did not penetrate his body. (Tr. IV/43; V/102). Ahmet bled profusely; however, he continued to fight the petitioner and Vaskanian. (Tr. IV/42, 45; V/102-03, 105-06, 108). He bit Vaskanian in the arm, and knocked the petitioner's mask off his face. (Tr. IV/43, 230, V/55-56, 106, 108). For a second or two, Fulia caught a glimpse of the petitioner's face. (Tr. IV/44). He was white and looked Russian. (*Id.*).

Finally, Koba opened the door and suggested to the others that they leave. (Tr. IV/45, 232; V/116). The three ran from the home, with Fulia and Ahmet in pursuit. (Tr. IV/45, 68,

232; V/117). The three intruders ran to Koba's car, which was parked away from the house. (tr. V/57). They had trouble getting into the car and getting it started, and these delays allowed Fulia and Ahmet to get a look at the car as it departed. (Tr. IV/45-46; V/57, 118-19). Ahmet and Fulia were able to give the police a description of the car which included the color, and an approximation of the make, model and license plate number of the vehicle. (Tr. IV/68, 149).

The police investigation began promptly. Fulia and Ahmet provided the police with their information about the car's license plate, as well as with descriptions of their assailants. (Tr. IV/91-92, 95-96, 149-50; V/106). Initial police work failed to disclose a suspect in the case.[4] However, subsequent analysis of two items of evidence left at the scene (a roll of blue tape and one of the "Jason" masks) led the police to the petitioner.[5]

The blue tape was examined by Officer Thomas Sheehan. (Tr. IV/130). By investigating where the tape could have been obtained, Officer Sheehan was directed to Alexi Koba. (*See generally*, Supp. Ans., Ex. 5, pp. 9-10 and transcript pages cited therein). Officer Sheehan telephoned Koba and requested that he speak with him at the police station. (Tr. IV/154). Koba complied and they arranged a meeting. (Tr. IV/139-40, 235-36).

At the station, following a recitation of the *Miranda* warnings, Officer Sheehan asked Koba what type of car he drove in October, 1999. (Tr. IV/154, 236). Koba response comported with the Aikens' description of the car their assailants drove, and Koba's license plate number was a variant of the number which Fulia had given. (Tr. IV149-52, 154). Officer Sheehan told

---

[4] A description of the initial police efforts not material to the instant habeas claim is set forth in the Brief of the Commonwealth on Appeal, Supp. Ans., Ex. 5, at pp. 7-10, and the transcript pages cited therein.

[5] For a discussion of the relevance of the "Jason" mask, please see footnote 6, below.

Koba that he wanted to discuss the Halloween invasion in which he was involved and that the police had recovered his fingerprints (a lie). (Tr. IV/177-78, 237; V/16-17). Koba, who later entered into a cooperation agreement with the Commonwealth, gave a seven-page statement to the police, detailing the crime and implicating the petitioner. (Tr. IV/144-45, 181-206, 238-39).

II.     Facts Regarding the Petitioner's Statement to the Police

On November 13, 2000, Officer Sheehan and Detective Donald Brown met with the petitioner at the West Springfield police station. (Tr. V/174). The petitioner stated that he understood his *Miranda* rights and signed a waiver form. (Tr. V/175-77, 183). The officers asked if he would be willing to speak with them. (Tr. V/176, 205-06, 218). Officer Sheehan informed the petitioner that they wished to discuss a home invasion which had occurred the previous Halloween. (Tr V/184, 206). The petitioner asserted that he was at the Six Flags amusement park with some friends. (Tr. V/184, 202-03). Officer Sheehan asked the petitioner for the names of those friends. (Tr. V/184, 203). The petitioner said that he did not want to tell him the names. (Tr. V/184, 223). After this refusal to disclose names, the petitioner's conversation with the police officers continued. (Tr V/203). The petitioner said that he did not believe that there was a particular offense of armed home invasion and that he did not believe the penalties which had been represented to him, and requested to see the statute. (Tr. V/210-11, 223). Detective Brown got a copy of the statute and showed it to him. (Tr. V/206-07, 211, 223). At some point, the officers read portions of Koba's statement to the petitioner. (Tr. V/206, 210). The petitioner claimed that he and Koba were enemies. (Tr. V/211, 222). The interview

concluded after half an hour.[6]  (Tr. V/208).   Officer Sheehan noted on the *Miranda* warning form: "Stated was at Six Flags with friends.  Wouldn't give names of friends." (Tr. V/185).

III.     Facts Regarding the Petitioner's Jailhouse Conversation with His Mother

The petitioner was transported to the Hampden County House of Correction.  From there, the petitioner spoke to his mother on the telephone.  (Tr. V/155-56).   The petitioner's mother asked him why he was in jail. (Tr. V/156).  The petitioner answered angrily, "I killed a fucking guy.  I shoot him.  I never be shoot if he don't hit me with the pan."  When his mother protested, "No, no, you didn't do it," the petitioner responded "No, I did.  I shoot him several times."  To his mother's statement, "You didn't kill him," the petitioner answered, "The next time he'll got more, he deserve more," and then laughed.  (Tr. V/156, 174-75, 178, 180-81).

## ARGUMENT

**THE PETITIONER IS NOT ENTITLED TO HABEAS CORPUS RELIEF WHERE THE APPEALS COURT'S ADJUDICATION OF HIS CLAIMS WAS NOT CONTRARY TO, OR AN UNREASONABLE APPLICATION OF, CLEARLY ESTABLISHED SUPREME COURT LAW.**

The petitioner asserts two claims in his instant habeas petition.  First, he claims that his Fifth Amendment right to remain silent was violated when the Commonwealth introduced evidence of his failure, during a conversation with police officers, to reveal the names of the friends he claimed to have been with on the night of the crime.  Next, he alleges that his due process rights under the Fifth and Fourteenth Amendments were violated by the Commonwealth's introduction of testimony concerning the petitioner's statement in a telephone

---

[6] While the petitioner was at the police station, his fingerprints were taken.  Detective Brown, who had lifted the fingerprints from the "Jason" mask, compared those prints to the petitioner's fingerprint card.  (Tr. V/158-59, 164-65).  The petitioner's left thumb print matched both prints on the mask.  (Tr. V/167-68).

call he made from jail when the tape recording of that statement had been lost. The petitioner's claims fail, however, since both of these issues have been decided against him by the Massachusetts Appeals Court, and he cannot show that the Appeals Court's determination was either contrary to or an unreasonable application of established federal law.

**I.      Standard of Review**

Since the instant petition was filed after the effective date of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), this Court's review is governed by that act. *Lindh v. Murphy*, 521 U.S. 320, 336, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). *See also* 28 U.S.C. § 2254. AEDPA "places a new constraint on the power of a federal habeas court to grant a state petitioner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court." *Williams v. Taylor*, 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Williams v. Matesanz*, 230 F.3d 421, 426 (1st Cir. 2000)("a federal [habeas] court operates within a closely circumscribed sphere"). As the Supreme Court recently reiterated, AEDPA requires a "'highly deferential standard for evaluating state-court rulings' . . . which demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 23, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002)(*per curiam*), *quoting Lindh*, 521 U.S. at 333, n.7. In relevant part, AEDPA precludes a federal court from granting habeas relief, unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. §2254(d)(1-2); *see also Tyler v. Cain*, 533 U.S. 656, 660, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001). In addition, under

AEDPA, state court determinations of factual issues "shall be presumed to be correct" unless the petitioner rebuts this "presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Coombs*, 202 F.3d at 18.

    A.    <u>The "Contrary To" Prong</u>

A state court decision is "contrary to" clearly established Supreme Court precedent in only two circumstances: (a) where "the state court applies a rule that contradicts the governing law set forth in" Supreme Court cases or (b) where "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [Supreme Court] precedent." *Williams v. Taylor,* 529 U.S. at 405-06. Under either scenario, in order to fall within the "contrary to" clause, the state court decision must be "substantially different," diametrically different," "opposite in character or nature," or "mutually opposed" to clearly established Supreme Court law. *Id.*

    B.    <u>The "Unreasonable Application Of" Prong</u>

A state court decision involves an "unreasonable application" of Supreme Court precedent "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Williams v. Taylor*, 529 U.S. at 407-09, 413. Merely that the state court reached an incorrect result is not sufficient -- the result also must be unreasonable. *L'Abbe v. DiPaolo*, 311 F.3d 93, 96 (1st Cir. 2002), *citing Williams v. Taylor*, 529 U.S. at 411; *see also McCambridge v. Hall*, 303 F.3d 24, 36-37 (1st Cir. 2002)(en banc)("'some increment of incorrectness beyond error is required' . . . The increment need not necessarily be great, but it must be great enough to make the decision unreasonable in the independent and objective judgment of the federal court"),

11

quoting *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir. 2000).  Where, for instance, the state court reaches a result that is "devoid of record support for its support for its conclusion or is arbitrary," the unreasonable application prong likely will be satisfied." *McCambridge*, 303 F.3d at 37, *citing O'Brien v. DuBois*, 145 F.3d 16, 25 (1st Cir. 1998).  *See also Kibbe v. DuBois*, 269 F.3d 26, 35 (1st Cir. 2001), *cert. denied,* 535 U.S. 960 (2002); *Hurtado v. Tucker*, 245 F.3d 7, 16 (1st Cir.), *cert. denied,* 534 U.S. 925 (2001).   In order for a federal habeas court to find that the "unreasonableness" prong has been met, the state court's determination of either the law or the facts must be *objectively* unreasonable.  *See Williams v. Taylor,* 529 U.S. at 411; *Williams v. Matesanz,* 230 F.3d at 426-27; *Torres v. Prunty*, 223 F.3d 1103, 1108 (9th Cir. 2000).

There is no bright-line rule as to what constitutes an "objectively unreasonable" application of federal law or determination of facts. *Williams v. Taylor*, 529 U.S. at 410 ("[t]he term 'unreasonable' is no doubt difficult to define").  As the Supreme Court has made clear, however, an incorrect state court determination is not necessarily an unreasonable one.  *Id.* ("the most important point is that an unreasonable application of federal law is different from an *incorrect* application of federal law")(emphasis in original).  It is well-settled that "a federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application [or determination] must also be unreasonable." *Id.* at 411. In order for a federal habeas court to find that the "unreasonableness" prong has been met, the state court's determination of either the law or the facts must be *objectively* unreasonable.  *See Williams v. Taylor,* 529 U.S. at 411; *Williams v. Matesanz*, 230 F.3d at 426-27; *Torres v. Prunty*, 223 F.3d 1103, 1108 (9th Cir. 2000).  *See also O'Brien v.*

*DuBois*, 145 F.3d 16, 25 (1st Cir. 1998).  This same standard should be applied to determine whether a state court's decision was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" under 28 U.S.C. § 2254(d)(2).  *See Torres*, 223 F.3d at 1108 (reasonableness standards under § 2254(d)(1) and (d)(2) are the same).

II.   **The Appeals Court's Decision That There Was No Violation of the Petitioner's Rights under *Doyle v. Ohio,* 426 U.S. 610 (1976), Was Not Contrary to or an Unreasonable Application of Established Federal Law.**

    A.   Standard to be Applied

The United States Supreme Court held in *Doyle v. Ohio*, 426 U.S. 610, 618-19 (1976), that a prosecutor may not use a criminal defendant's silence after having received *Miranda* warnings to impeach that defendant's exculpatory statement offered subsequently at his trial.  The Court explained that such use of a defendant's silence violates the Due Process Clause of the Fourteenth Amendment because "[s]ilence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights.  Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." *Id.* at 617.  The Supreme Court had refined the *Doyle* rule by holding that it does not apply when a criminal defendant does not remain silent.  Specifically, the Court had held that cross-examination of a defendant concerning prior inconsistent statements made after *Miranda* warnings does not a constitute a *Doyle* violation: "[s]uch questioning makes no unfair use of silence, because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent.  As to the subject matter of his statements, the defendant has not remained silent at all."  *Anderson v. Charles*, 447 U.S. 404, 408 (1980).

B.     Federal Law Applied to the Petitioner's Habeas Claim

The challenge that the petitioner makes to the introduction into evidence at trial of his statement made to officers after he was provided his *Miranda* warnings is insufficient to warrant habeas relief because the Appeals Court's determination that the introduction did not constitute a *Doyle* error was not an unreasonable application of clearly established Supreme Court precedent. *See Vieux v. Pepe,* 184 F.3d at 65; *O'Brien v. DuBois*, 145 F.3d at 24-25; *Drinkard v. Johnson*, 97 F.3d 751, 767-68 (5th Cir.), *cert. denied*, 117 S.Ct. 1114 (1997); *Lindh v. Murphy*, 96 F.3d 856, 868, 877 (7th Cir. 1996), *rev'd on other grounds*, 117 S.Ct. 2059 (1997); *see also* 28 U.S.C. § 2254(d)(1). The Supreme Court's decision in *Doyle v. Ohio* does not prescribe a rule which governs the petitioner's claim because, after the petitioner was arrested and had his *Miranda* warnings read to him, he agreed to make a statement to the police, rather than choosing to remain silent. *Anderson*, 477 U.S. at 408.

The Appeals Court based its decision "substantially on the reasoning and the cases cited in the Commonwealth's brief." *See Commonwealth v. Lutskov*, 60 Mass.App.Ct. 1115, Supp. Ans., Ex. 7; *see also* Brief for the Commonwealth, Supp. Ans., Ex. 5, pp. 13-18. In so doing, the Appeals Court implicitly acknowledged that the petitioner spoke with the police after waiving his *Miranda* rights, and that the conversation between the petitioner and the police continued after the petitioner declined to tell the police the names of the people he had allegedly been with on the night of the crime. *See* Supp. Ans., Ex. 7; Supp. Ans., Ex. 5, p. 16. The Appeals Court thus accepted that "a single refusal to answer a single question during an interrogation that included give-and-take both before and after the refusal . . . did not constitute an invocation of the [petitioner's] right to remain silent." *See* Supp. Ans., Ex. 5, p. 17. The Appeals Court also

cited to Massachusetts cases in which the *Doyle* case had been analyzed in circumstances analogous to the petitioner's, and determined that the petitioner had not stated a claim for a *Doyle* violation. *See* Supp. Ans., Ex. 7, citing *Commonwealth v. Donovan*, 58 Mass.App.Ct. 631, 636-38 & n.4 (2003)("Where a defendant has waived his right to remain silent, the failure to answer a particular question or fill in gaps of information during the police interview is not the exercise of the right to remain silent").

The only Supreme Court precedent to which the petitioner cites in support of his claim of constitutional error is *Doyle v. Ohio.* This case provides only that a petitioner's silence in the face of *Miranda* warnings cannot be used to impeach an exculpatory explanation made subsequently at trial. There is no question that the petitioner did not remain silent in the face of *Miranda* warnings. He, like the criminal defendant in *Anderson v. Charles*, 447 U.S. at 408, chose to make a statement. There is no constitutional right to be free from a challenge to the strength of an alibi offered after a waiver of *Miranda* rights. *See Lofton v. Wainwright*, 620 F.2d 74, 75 (5th Cir. 1980)(finding that "*Doyle's* protection of the right to remain silent does not apply to cross-examination and argument concerning a defendant's exculpatory explanation given after the *Miranda* warnings"). *See also Bui v. DiPaolo*, 170 F.3d at 243 (when circuits courts of appeal regularly decide cases in a way similar to the state court's decision, the state court's application of federal law cannot be deemed unreasonable). Since the petitioner cannot show that the Appeals Court's decision was either contrary to or an unreasonable application of established federal law as determined by the Supreme Court, his habeas claim based on an alleged *Doyle* violation must be denied.

### III. The Appeals Court's Decision That Petitioner's Due Process Rights Were Not Violated by the Admission of His Statement to His Mother Was Neither Contrary to Nor an Unreasonable Application of Established Supreme Court Precedent.

The petitioner claims that his due process rights were violated by the introduction of testimony about a statement he made on the jailhouse telephone where the Commonwealth had lost the tape recording of that statement. The petitioner's claim fails, however, because the claim has already been denied by the Massachusetts Appeals Court, using a standard even more favorable to the petitioner than that established under federal law. Moreover, the petitioner cannot show that the Appeals Court's decision was either contrary to, or an unreasonable application of, established Supreme Court jurisprudence in this matter.

#### A. Standard to be Applied

When disputed evidence is no longer in the government's possession, the constitutional ramifications of destruction of such evidence are evaluated according to the Supreme Court jurisprudence of *Arizona v. Youngblood*, 488 U.S. 51 (1988), and *California v. Trombetta*, 467 U.S. 479 (1984). The First Circuit, taking *Youngblood* and *Trombetta* together, has created a three-part test for determining if a defendant's due process rights under the Fifth and Fourteenth Amendments have been infringed by law enforcement's failure to preserve evidence. *United States v. Femia*, 9 F.3d 990, 993 (1st Cir.1993). To prevail on a claim asserting violation of due process, a defendant must show that the government, in failing to preserve evidence, (1) acted in bad faith when it destroyed evidence, which (2) possessed an apparent exculpatory value and which (3) is to some extent irreplaceable. *Id.* at 993-94; *see also United State v. Dumas*, 207 F.3d 11, 15 (1st Cir. 2000).

16

B.Federal Law Applied to the Petitioner's Habeas Claim

The petitioner's due process claim must fail because he cannot show that the Appeals Court's decision rejecting his due process claim was contrary to or an unreasonable application of clearly established federal law. While the Appeals Court's decision rests on an analysis under the Massachusetts, rather than the federal, standard, this does not assist the petitioner's habeas claim, since the Massachusetts standard is more favorable to the petitioner than is the federal standard. *See Otsuki v. Dubois,* 994 F.Supp. 47, 56 (D. Mass. 1998)(the test used by the SJC is "more favorable to the petitioner that the federal test established in *Youngblood* and *Trombetta*"). *See also Commonwealth v. Lutskov,* 60 Mass.App.Ct. at 1115, Supp. Ans., Ex. 7 (noting that its decision was "based substantially on the reasoning and the cases cited in the Commonwealth's brief"); Brief of the Commonwealth on Appeal, Supp. Ans., Ex. 5, pp. 20-25 (analyzing the petitioner's claim under the Massachusetts standard set forth in *Commonwealth v. Willie,* 400 Mass. 427 (1987)). A finding that there has been no due process violation made by applying the test set forth in *Commonwealth v. Willie*, 400 Mass. 427 (1987), is not "contrary to or involv[ing] an unreasonable application of clearly established federal law." *Otsuki,* 994 F.Supp. at 56; *see also Commonwealth v. Willie,* 400 Mass. at 432 (Massachusetts test calls for the balancing of the culpability of the Commonwealth, the materiality of the evidence, and the potential prejudice to the defendant). As the petitioner does not cite any case which demonstrates that the Massachusetts Appeals Court's holddisregards Supreme Court precedent, his habeas claim should be denied.

However, even if this Court were to examine the merits of the petitioner's claim under the federal standard, his claim would still fail, since he cannot pass even the first prong of the

17

*Youngblood-Trombetta* tripartite test.[7] The petitioner does not even allege, much less show, bad faith on the part of law enforcement. In missing evidence cases, "the presence or absence of good or bad faith by the government will be dispositive," *Femia*, 9 F.3d at 994, and "unless a defendant can show bad faith on the part of police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58. At most, petitioner makes the claim that the Commonwealth was "grossly negligent" or "culpable" for the "sloppy conduct" resulting in the destruction of the audiotapes.[8] *See* Petitioner's Memorandum, pp. 13-15. Assuming arguendo that the government did fall below the proper standard of care in dealing with evidence, even "gross negligence" on the part of law enforcement does not impart a finding of bad faith under *Youngblood* and *Trombetta*, thus undermining petitioner's entire due process claim. *Femia*, 9 F.3d at 995 ("the district court clearly erred in finding a due process violation because these tapes were destroyed due to the government's gross negligence, not bad faith."); *see also United States v. Smith*, 1995 WL 399060 at *2 (6th Cir. 1995) ("[e]ven gross negligence is not equivalent to bad faith.").

---

[7] Since the petitioner cannot succeed on the first prong of the *Youngblood-Trombetta* test, there is no need to address the other two prongs of the test. However, the petitioner could not present evidence sufficient to carry his burden on those prongs either, since he cannot present evidence of the exculpatory value that was apparent before the evidence was destroyed. *United States v. Femia*, 9 F.3d at 995. Likewise, he cannot show that the evidence is to some extent, irreplaceable, or t comparable evidence cannot be obtained by reasonably available means, since he could have obtained evidence of jest or sarcasm through his own testimony, the testimony of his mother, or cross-examination of the guard who heard the call. *See Youngblood*, 488 U.S. 51; *United States v. Marshall*, 109 F.3d 94 (1st Cir. 1997)(burden is on petitioner to prove the prongs of the *Youngblood- Trombetta* test).

[8] This claim has been rejected by the state court motion judge, who found that the Commonwealth to be simply "negligent in the loss created perhaps by the 'casual system' employed to request the monitoring and preservation of the tape." *See* Findings of Fact, Supp. Ans., Ex. 3, p. 3.

Aside from the petitioner's failure to assert bad faith on the part of the Commonwealth, the record simply does not support such a finding.[9] The judge who heard the motions in limine determined that the Commonwealth was "negligent in the loss created perhaps by the 'casual system' employed to request the monitoring and preservation of the tape." Supp. Ans., Ex. 3, p. 3. Destruction of evidence in accordance with established procedure is not evidence of bad faith. *See United States v. Shea*, 211 F.3d 658 (1st Cir. 2000), *cert. denied sub nom Shea v. United States*, 531 U.S. 1154 (2001); *United States v. Deaner,* 1 F.3d 192, 200 (3rd Cir. 1993)(holding that "destruction of evidence in accordance with an established procedure precludes a finding of bad faith absent other compelling evidence").

The only Supreme Court case cited by the petitioner in support of his argument that his due process rights were infringed by the introduction of testimony about his statement is *Arizona v. Youngblood*, 488 U.S. 51 (1988). As is noted above, the petitioner is unable to make a showing that the Appeals Court's decision was an unreasonable application of *Youngblood* or any other established Supreme Court precedent, his habeas claim must be denied. *See Vieux v. Pepe*, 184 F.3d at 66; *O'Brien v. DuBois*, 145 F.3d at 25.

## **CONCLUSION**

For the foregoing reasons, the respondent requests that this Court deny the petition for a writ of habeas and dismiss the petitioner's complaint in its entirety.

---

[9] As the Brief of the Commonwealth correctly notes, review of this issue on direct appeal (and on collateral review) is limited to the facts which were presented to the motion judge on this point. *See* Brief for the Commonwealth on Appeal, Supp. Ans., Ex. 5, p. 19. Citations to testimony given at trial, after the motion hearing, may not properly be considered in review of a judge's ruling on a pre-trial motion. *See id.,* citing *United States v. Hicks*, 978 F.2d 722, 724-25 (D.C. Cir. 1992); *Commonwealth v. Bowie*, 25 Mass.App.Ct. 70, 74 (1987).

        Respectfully submitted,

        THOMAS F. REILLY
        ATTORNEY GENERAL


        /s/ Maura D. McLaughlin
        Maura D. McLaughlin (BBO # 634923)
        Assistant Attorney General
        Criminal Bureau
        One Ashburton Place
        Boston, Massachusetts 02108
        (617) 727-2200, ex. 2857

Dated: April 15, 2005