# United States District Court
# District of Massachusetts

MAKSIM  LUTSKOV,
        Petitioner,

    v.                           CIVIL ACTION NO. 04-12601-PBS

LOIS RUSSO,
        Superintendent, Souza-Baronowski
        Correctional Center,
            Respondent.

# *REPORT AND*
# *RECOMMENDATION ON PETITION*
# <u>*FOR WRIT OF HABEAS CORPUS (#1)*</u>

COLLINGS, U.S.M.J.

## *I.  Introduction*

On December 9, 2004, Maksim Lutskov ("petitioner") commenced the

instant action by filing a petition for writ of habeas corpus (the "petition")

pursuant to 28 U.S.C § 2254 (#1), an Addendum to Petition Under 28 U.S.C.

§ 2254 for Writ of Habeas Corpus (#2) and a Legal Memorandum In Support

of Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus (#3).

On February 14, 2005, Lois Russo ("respondent") filed a Motion to Dismiss Petition for Writ of Habeas Corpus (#6), a Memorandum in Support of Motion to Dismiss (#7) and a Supplemental Answer (#9).  On February 25, 2005, petitioner filed an Assented to Motion to Amend Petition for Habeas Corpus to Strike Issue III (#11)  and a Response to Respondent's Motion to Dismiss Petition for Habeas Corpus (#12).  The Motion to Dismiss (#6) was rendered moot when Judge Saris granted petitioner's Motion to Amend (#11) on March 9, 2005.

On February 15, 2005, respondent filed an Answer and Affirmative Defenses (#10).  On February 28, 2005, petitioner filed a Brief in Support of Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus (#13), and on April 15, 2005, respondent filed a Memorandum of Law in Opposition to Petitioner's Petition for Habeas Corpus Pursuant to 28 U.S.C. § 2254 (#14).

The case has been referred to the undersigned for the issuance of a Report and Recommendation on the petition (Order of Reference #4).  For the reasons discussed below, the Court shall recommend that the petition be denied.

## II. The Facts and the Procedural History[1]

### A.    Facts Regarding Crimes of Which Petitioner was Convicted

On October 31, 1999, petitioner and two accomplices, Alexi Koba ("Koba") and Artem Vaskanian ("Vaskanian"),  posed as trick-or-treaters and gained forced entry into the home of Ahmet Aiken ("Aiken") and his 18 year old daughter, Fulia.  Petitioner was wearing a hockey mask as part of his purported costume; the mask was knocked off and left behind in the ensuing struggle with Aiken.  Police subsequently lifted two clear fingerprints from the mask.

After banging on Aiken's door sometime after 8:30 p.m., petitioner and his accomplices accepted Halloween candy from Fulia (who had opened the door), then forced their way inside, pushing her against the wall and trying to tape her hands together.  She noted that the attackers had Russian accents. Aiken heard Fulia screaming for help and rushed downstairs.  Petitioner confronted Aiken with pistol drawn and ordered him to sit down and divulge the location of his safe.  Aiken sat down and indicated a drawer which

---

[1] The petitioner's recitation of the facts and procedural history is set out at pp. 1-8 of his Memorandum of Law (#13), and the respondent's version is at pp. 3-9 of her Opposition brief (#14). The decision of the Massachusetts Appeals Court, *Commonwealth v. Lutskov*, 60 Mass. App. Ct. 1115, 803 N.E.2d 359(2004)(table), contains no independent recitation of facts, but relied on "the reasoning and the cases cited in the Commonwealth's brief."  For the purposes of brevity, I restate herein only those facts that are relevant for purposes of issuing a Report and Recommendation on the instant petition and often quote the facts verbatim from the Respondent's Opposition. (Citations are omitted except where a fact is drawn from a source other than the Respondent's Opposition.)

contained money. Aiken detected a Russian or Polish accent in petitioner's speech.

Fulia was still struggling against the efforts of Koba and Vaskanian to tape her up, and when they began attempting to tape her mouth, Aiken grabbed a frying pan and attacked. In response, petitioner fired three shots at Aiken; one bullet lodged in his arm, one in his stomach, and the third did not penetrate his body. Bleeding profusely, Aiken continued to fight petitioner and Vaskanian, knocking petitioner's hockey mask off. Fulia caught a glimpse of petitioner's face, noting that he was white and looked Russian. Petitioner and his accomplices fled the house soon thereafter with Aiken and Fulia in pursuit. The victims were able to give an approximate description of the make, model and license number of the vehicle in which the attackers fled.

On December 27, 2000, a Hampden County grand jury returned indictments alleging that on October 31, 1999, the petitioner, a youthful offender, committed the following crimes: home invasion in violation of M.G.L. c. 265 § 18C; assault and battery with a dangerous weapon (hereinafter, "ABDW") (a gun); ABDW (a stick or unknown wooden object); ABDW (a gun) with intent to rob; ABDW (a knife); and assault and battery.

On November 15, 2001 after a trial in the Massachusetts Superior Court

(Dunbar, J., presiding), a jury found petitioner to be a youthful offender on all charges.  On January 4, 2002, after finding that petitioner was not capable of rehabilitation within the juvenile justice system, Justice Dunbar sentenced petitioner to twenty years to twenty years and one day on the charge of home invasion, and nine to ten years from and after the sentence on the home invasion charge, suspended with probation for ten years, on the charge of ABDW with a handgun.  The following sentences were imposed to be served concurrently with the home invasion sentence:  nine to ten years for the charge of ABDW with a stick or wooden object; ten to twenty years  for the charge of assault with intent to rob; three to five years for the charge of ABDW with a knife; and two to two and one-half years on the charge of assault and battery.

B.    *Facts Regarding Jailhouse Telephone*
*Conversation between Petitioner and his Mother*

An investigation by Springfield, Massachusetts police resulted in petitioner's arrest in the fall of 2000 after Koba, who met with the police, gave a seven-page statement detailing the crime and implicating petitioner.  On or before November 8, 2000, petitioner was transported to the Hampden County House of Correction (the "House of Correction").  Each time an inmate makes a phone call from the House of Correction, a recording informs the caller that

the calls are recorded and monitored. (#9, Ex. 5, p. 19) On November 8, 2000,

petitioner spoke in Russian to his mother on the telephone.  According to the

trial testimony of one Officer Orel ("Orel"), whose native language is Russian,

the following colloquy occurred:

> She asked him why he was in jail.  He answered "I
> killed a fucking guy.  I shoot him.  I never be shoot if
> he don't hit me with the pan."  When his mother
> protested, "No, no, you didn't do it," petitioner
> responded "No, I did.  I shoot him several times."  To
> his mother's statement, "You didn't kill him," petitioner
> answered, "The next time he'll got more, he deserve
> more," and then laughed.

In January or February, 2001, Assistant District Attorney Donna S. Donato

("Donato") wrote an undated request on a steno pad to the jail's keeper of the

records, Officer John Kenney ("Kenney"), asking him to monitor the calls made

by petitioner. (#9, Ex. 4, p. 36)  Orel was assigned to monitor petitioner's calls

and act as interpreter (since petitioner and his mother spoke Russian to each

other). (#9, Ex. 4, p. 36)    On May 1, 2001 (almost six months after the

conversation at issue took place), Donato sent a subpoena to Kenney requesting

that the tape of petitioner's phone conversation be copied and released to her.

(#9, Ex. 4, p. 37)   At that time, Kenney realized that the tapes from November

had been erased in the ordinary course of operation of the House of Correction

6

telephone system. (#9, Ex. 4, p. 37)

On August 20, 2001, the Commonwealth notified the defense that it intended to use a statement at trial that he made to his mother on the jailhouse telephone on November 8, 2000. (#9, Ex. 3, p. 14) The statement was: "He [sic] lucky I didn't kill him after he hit me with that pan." (#9, Ex. 3, p. 14) Petitioner and his defense counsel never gained access to the audiotape of the conversation between petitioner and his mother prior to its destruction. (#13, p. 8)

### C.  Facts Regarding Petitioner's Interrogation by Springfield Police

On November 13, 2000, petitioner met with Officer Sheehan ("Sheehan") and Detective Donald Brown ("Brown") at the West Springfield police station.[2] After Petitioner stated that he understood his *Miranda* rights and signed a waiver form, the officers asked if he would be willing to speak with them. Sheehan informed petitioner that they wished to discuss a home invasion which had occurred the previous Halloween. Petitioner asserted that on the day in question he had been at Six Flags amusement park with some friends. Sheehan asked petitioner for the names of those friends. Petitioner said that he did not

---

[2]
      While at the police station, petitioner's fingerprints were taken. Petitioner's left thumb print matched both prints lifted from the hockey mask left at Aiken's house.

want to tell him the names. After this refusal to disclose names, the conversation with the officers continued.

Petitioner then told the officers that he did not believe that there was a particular offense of armed home invasion and he did not believe the penalties which had been represented to him; he requested to see the statute. Brown procured a copy of the statute and showed it to him. At some point, the officers read portions of Koba's statement to the petitioner, who claimed that he and Koba were enemies. The interview concluded after half an hour. Sheehan noted on the *Miranda* warning form: "Stated was at Six Flags with friends. Wouldn't give names of friends."

During the trial of this matter, Brown testified that petitioner signed a *Miranda* warning form and indicated a willingness to talk. He further testified that when he asked petitioner for the names of the friends he was with at Six Flags, petitioner would not provide those names to him. The *Miranda* warnings form which contained Brown's handwritten notation, "Stated was at Six Flags with friends. Wouldn't give names of friends," was entered into evidence.

Prior to trial, on October 30, 2001, Judge Dunbar conducted an

evidentiary hearing on dueling motions in limine.  Petitioner sought to exclude, and the Commonwealth sought to introduce, evidence of the jailhouse telephone statement petitioner made to his mother. Petitioner sought to exclude evidence of the conversation due to the fact that the Commonwealth had lost the audio recording of the statement.  (The statement was "He [sic] lucky I didn't kill him after he hit me with that pan.").  Judge Dunbar allowed the Commonwealth's motion and made written findings of fact and conclusions of law (#9, Ex. 3) ruling that although the Commonwealth was negligent in not preserving the conversation, there was insufficient evidence that the conversation would be exculpatory, and that in considering the entire record, there was no evidence that the missing audiotape would create  reasonable doubt as to petitioner's guilt.

### D.   Proceedings in State Court After Conviction

Petitioner filed a notice of appeal on January 16, 2002, and the appeal was docketed on October 15, 2002.  On February 5, 2004, the Massachusetts Appeals Court issued an order denying the petitioner's appeal.  The Appeals Court held, in pertinent part, that "[n]othing has been made to appear that would cause us to conclude that there was a violation of the defendant's rights under *Doyle v. Ohio*, 426 U.S. 610 (1976)." *Commonwealth v. Lutskov*, 60 Mass.

9

App. Ct. 1115 at ***1, 803 N.E.2d 359 at ***1, *rev. denied,* 441 Mass. 1106, 806 N.E.2d 102 (2004).   Petitioner filed an Application for Further Appellate Review with the Massachusetts Supreme Judicial Court, but this application was denied on March 31, 2004.  The instant habeas petition was filed on December 9, 2004.

### III.  *Analysis*

Title 28 U.S.C. § 2254(d), the applicable habeas corpus statute, states:

> An application for writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The petitioner has asserted that he is entitled to habeas relief based on two[3] separate grounds.  Those grounds are as follows:

---

[3]

The petition initially contained a third ground for habeas relief, "cumulative effect of the errors" (#1, p. 6), but was subsequently amended to strike that ground  (#11, Assented to Motion To Amend Petition For Writ of Habeas Corpus To Strike Issue III).

Ground 1: The admission into evidence of petitioner's decision not to answer Officer Sheehan's question concerning who he was with at Six Flags on the day of the incident violated his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution. (#13, pp. 8)

Ground 2: The Commonwealth's loss and destruction of the audiotape of the telephone conversation between petitioner and his mother violated petitioner's due process right to a fair trial as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution. (#13, pp. 11)

Because I will recommend that the petition be denied, I will address both of the grounds raised by petitioner and explain why neither provides a basis for habeas relief.

Under the statute, I must determine whether any of the state court legal determinations was "contrary to" or an "unreasonable application of" established Supreme Court law.[4]  In order to make such determinations, it is necessary first to set forth the applicable standards.

*A. Standards*

1.  "Contrary to" Standard

The Supreme Court has explained that "a state court decision is 'contrary

---

[4]

Petitioner does not argue that the state court decisions were based on unreasonable determinations of fact in light of the evidence presented.  Thus, I need not address 28 U.S.C. § 2254(d)(2).

11

to our clearly established precedent if the state court applies a rule that

contradicts the governing law set forth in our cases' or 'if the state court

confronts a set of facts that are materially indistinguishable from a decision of

this Court and nevertheless arrives at a result different from our precedent.'"

*Lockyer v. Andrade*, 538 U.S. 63, 73 (2003)(citing *Williams v. Taylor,* 529 U.S.

362, 405-06 (2000)).  In deciding whether the "contrary to" prong applied, the

First Circuit in *Hurtado v. Tucker* stated that "this case presents a good example

of one to which § 2254(d)(1)'s 'contrary to' prong does not apply: 'a run-of-the-

mill state-court decision applying the correct legal rule from [the Supreme

Court's] cases to the facts of a prisoner's case.'"  245 F.3d 7, 15 (1 Cir.), *cert.*

*denied*, 534 U.S. 925 (2001) (quoting *Williams*, 529 U.S. at 405-06 (2000)).

    2.   "Unreasonable Application of" Standard

> The Supreme Court in *Williams* held that a state court decision would involve an "unreasonable application of" clearly established Supreme Court precedent if it "identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case...."  The Court also underscored that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law...."  Indeed, because Congress used the word "unreasonable" in § 2254(d)(1), and not words like "erroneous" or "incorrect," a federal habeas court "may not issue the writ simply because that court concludes in its

> independent judgment that the relevant state-court
> decision applied clearly established federal law
> erroneously or incorrectly. Rather, that application
> must also be unreasonable."

*Hurtado,* 245 F.3d at 15-16 (quoting *Williams,* 529 U.S. at 410-11)(internal citations omitted)(emphasis in original).

The *Hurtado* court explained further that "the Supreme Court in *Williams* explicitly rejected the view...that an 'unreasonable application of' clearly established federal law requires that the application be one that *all* reasonable jurists would agree was unreasonable....Thus, the test is an objective one and not so stringent as to require that all reasonable jurists agree the state court decision was unreasonable." 245 F.3d at 17 (emphasis in original); *see also McCambridge v. Hall*, 303 F.3d 24, 36 (1 Cir., 2002)(overruling *O'Brien v. Dubois*, 145 F.3d 16, 25 (1 Cir., 1998) and *Williams v. Matesanz*, 145 F.3d 16 (1 Cir., 1998) in holding that for a state court determination to be considered an "unreasonable application" of federal law, there must be "some increment of incorrectness beyond error" such that the decision is considered unreasonable in the "independent and objective judgment of the federal court"(internal quotations and citation omitted)). I must decide now whether any of the state court determinations in petitioner's case was contrary to or an unreasonable application of established Supreme Court precedent.

*B.  The Petitioner's Asserted Grounds for Habeas Relief*

<u>1.</u>    Admission into Evidence at Trial of Petitioner's Refusal to
Answer a Question During Police Interrogation is a
<u>Violation of Constitutional Rights Under *Doyle*. (Ground 1)</u>

Petitioner argues that his conviction was obtained in violation of his

Federal constitutional right against self-incrimination. (#1, ¶ 12A)   He claims

that the admission  into evidence of his refusal to give the names of the friends

with whom he allegedly spent the day of October 31, 1999 at Six Flags

amusement park was a violation of his Fifth, Sixth and Fourteenth Amendment

rights. (#13, p. 8)    More specifically, petitioner contends that Brown's

testimony at trial regarding this refusal, and the admission into evidence of a

*Miranda* warning form with a notation referring to the same refusal, constitute

a violation of his constitutional rights as enunciated in *Doyle v. Ohio*, 426

U.S.610 (1976). (#13, p. 11)[5]

In support of his contention, petitioner cites the following language from

*Doyle*, 426 U.S. at 618: "...while it is true that the *Miranda* warnings contain no

express assurance that silence will carry no penalty, such assurance is implicit

to any person who receives the warnings." (#13, p. 9)   The crux of petitioner's

---

[5]

Petitioner does not here argue that his refusal to answer Sheehan's question was an implicit  re-assertion of his previously waived *Miranda* rights.

legal argument is contained in language cited from *Commonwealth v. Waite*, 422 Mass. 792, 797 (1996), citing *Doyle*, 426 U.S. at 618: "A defendant's silence after the police have given the warnings mandated by *Miranda v. Arizona*, 384 U.S. at 467-479, may not be used against that defendant...[T]o do so would 'penalize' the invocation of the right to silence." (#13, p. 9)  Accordingly, petitioner argues that his refusal to answer Sheehan's question regarding the names of his friends who were with him at Six Flags was constitutionally protected "silence" under *Doyle*, and as such should have been inadmissible as evidence of guilt at trial.  (#13, p. 11)

It is undisputed that petitioner's refusal to answer was entered into evidence at trial. (#14, p. 9;  #9, Ex. 5, p. 13)  Accordingly, if the evidence on record clearly demonstrated that petitioner's refusal to answer Sheehan's question was "silence" within the holding of *Doyle*, then the use of that "silence" at trial could be a proper ground for habeas relief.  *See Doyle*, 426 U.S. at 617. Although it is not made explicit in his brief, petitioner seems to contend that the state court's decision was "contrary to" the established Supreme Court precedent of *Doyle*.  Thus, analysis of this ground of the petition will focus on whether "the state court confront[ed] a set of facts that [were] materially indistinguishable from" the facts of *Doyle*, but "nevertheless arrive[d] at a result

different from" the result in *Doyle*. *See Lockyer*, 538 U.S. at 73 (citing *Williams v. Taylor*, 529 U.S. 362 at 405-06 (2000)).

In *Doyle*, the defendants were arrested in a police sting operation and charged with selling marijuana to a local narcotics bureau informant. *Doyle*, 426 U.S. at 611. After being informed of their *Miranda* rights, the defendants chose to remain silent and did not present an exculpatory story until trial. *Id.* The State argued that "the discrepancy between an exculpatory story at trial and silence at time of arrest gives rise to an inference that the story was fabricated somewhere along the way..." *Id.* at 616. The Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." *Doyle*, 426 U.S. at 619. The Court further stated:

> [s]ilence in the wake of [the Miranda] warnings may be nothing more than the arrestee's exercise of these Miranda rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested....In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

*Doyle,* 426 U.S. at 617 (internal citations omitted).

The Court in *Doyle* emphasized the ambiguity of silence precisely because

16

the defendants said nothing at the time of their arrest, refusing to speak with the arresting officer at all about the charges against them, unlike the petitioner here, who signed a *Miranda* waiver form and immediately proffered an exculpatory story to police. (#14, p. 8)  In the instant case, petitioner produced neither evidence of an affirmative assertion of his *Miranda* rights, nor of a post-arrest silence that could only fairly be construed, as in *Doyle*, as an assertion of those rights.  Rather, the record clearly reflects an undisputed written waiver of petitioner's *Miranda* rights, followed by an interrogation during which petitioner refused to answer only a single isolated question. (#14, p. 8)  Moreover, subsequent to expressing his desire not to answer Sheehan's alibi question, petitioner initiated further conversation with police by challenging representations made to him concerning the penalty for home invasion, and asking to be shown the Massachusetts home invasion statute.  (#13, p. 7)  In sum, petitioner's post-arrest "silence" was quite different from the silence adhered to by the defendants in *Doyle*, who never waived their rights, and did not break their silence until trial.  *Doyle*, 426 U.S. at 411.

The Supreme Court further clarified the rule of *Doyle* in *Anderson v. Charles*, 447 U.S. 404 (1980).  The defendant in *Anderson* was convicted of first degree murder, and through a series of appeals was eventually granted a writ

17

of habeas corpus by the Sixth Circuit Court of Appeals.   Upon police interrogation, and after *Miranda* warnings, the defendant voluntarily gave a statement in which he claimed to have stolen a car from a certain location. *Anderson*, 447 U.S. at 406.   At trial, the defendant testified that he had stolen the car from a different location, and the prosecution used this inconsistency to impeach the defendant's testimony.   *Id.*

The Court of Appeals based its decision to grant the defendant's petition on the following rationale: "'...the prosecutor's questions about [defendant's] post-arrest failure to tell officers the same story he told the jury violated due process' under the rule of *Doyle v. Ohio*, 426 U.S. 610...."   *Anderson*, 447 U.S. at 407, quoting 610 F.2d 417, 422 (6 Cir., 1979).   The writ was then reversed by the Supreme Court which distinguished *Anderson* from *Doyle*, stating:

> *Doyle* bars the use against a criminal defendant of silence maintained after receipt of governmental assurances but it does not apply to cross-examination that merely inquires into prior inconsistent statements; such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent.   As to the subject matter of his statements, the defendant has not remained silent at all.

*Anderson,* 447 U.S. at 408 (citations omitted).   *See also United States v. Crowder*, 719 F.2d 166, 172 (6 Cir., 1983), *cert. denied,* 466 U.S. 974 (1984) ("What

*Anderson v. Charles* teaches is that the *Doyle* rule has no application unless the defendant has remained silent and could be considered to have done so in reliance on the implied assurances of the *Miranda* warnings.").

Similar to petitioner, the defendant in *Anderson* chose not to exercise his right to silence–he waived his *Miranda* rights by voluntarily speaking to police after receiving the *Miranda* warnings.  Petitioner here explicitly waived his rights by signing a waiver form and then voluntarily engaged in conversation with police.  The court's rationale in *Anderson* draws a distinction between silence as the assertion of one's *Miranda* rights, and silence as the subject matter of statements made subsequent to a waiver of those rights.

Thus, the *Anderson* decision makes clear that *Doyle* protects the "insolubly ambiguous" silence which inherently functions as an assertion of *Miranda* rights, but not an intermittent silence which is merely the subject matter of a statement made subsequent to a waiver of rights.  It seems apparent from the evidence on record that petitioner's refusal to answer Sheehan's alibi question was part of the subject matter of his statement to police.[6]  In other words, petitioner here cannot be said to have remained silent in reliance on the assurances of *Miranda*.  He clearly waived his rights, spoke to police, chose not

---

[6]

No argument was put forth by petitioner in his petition or his memorandum that his selective silence should be construed as a revocation of his earlier *Miranda* waiver.

19

to answer one question and then continued to speak to police.

In a factually analogous case, *United States v. Goldman*, 563 F.2d 501, 504 (1 Cir., 1977), *cert. denied*, 434 U.S. 1067 (1978), the defendant argued that his rights were violated when the prosecutor during the case-in-chief and in summation commented on the defendant's refusal to give the names of certain relatives. The court held that there was no constitutional violation because after the *Miranda* warnings were given, the defendant "chose to make an exculpatory statement, and he answered most of the agent's questions probing that statement," there was no indication "that he wished to reassert his right to remain silent" and the "decision not to answer the question about [the] Israeli cousins was simply a strategic choice, perhaps based on fear that any answer might weaken the story." *Goldman*, 563 F.2d at 504.[7] Similarly, in the case at bar, petitioner spoke at length to the police after waiving his *Miranda* rights, made a strategic decision not to give the names of his friends, went on speaking to the police after deciding not to answer that one question and never reasserted his right to remain silent.

---

[7]

Interestingly, even though *Goldman* was decided after *Doyle,* the *Goldman* court makes no mention of *Doyle* but addresses the issues only under *Miranda*. This makes no difference, however, in the decision on the instant case because it is clear under *Doyle* that petitioner's refusal to answer the question about the names of his friends can not be considered "silence."

As one Circuit Court explained, "there must be an indication that [petitioner] has invoked the right to remain silent. [Petitioner] cannot be said to have invoked his fifth amendment right regarding his willingness to discuss his involvement in the crime because, in the same breath, he denied any involvement." *Bradley v. Meachum*, 918 F.2d 338, 342-43 (2 Cir., 1990), *cert denied,* 501 U.S. 1221 (1991). The *Bradley* court ultimately held that "any reference at trial to [petitioner's] statement that he would not discuss whether he was involved in the robbery was permissible, because the statement was not the functional equivalent of silence under the fifth amendment." 918 F.2d at 343.  Likewise, petitioner's failure to answer a solitary question in this case simply does not amount to silence such that there could be any *Doyle* violation.

Accordingly, because the facts of petitioner's case are clearly distinguishable from *Doyle*, the state court's decision that "there was [no] violation of the [petitioner's] rights under *Doyle v. Ohio*" (60 Mass.  App. Ct. 1115, 803 N.E.2d 359) was not contrary to established Supreme Court precedent.   In other words, petitioner's purported mid-interrogation "silence" was not the "insolubly ambiguous" silence protected by the rule of *Doyle*, as clarified by *Anderson*. Thus, as to Ground 1, there is no basis for granting petitioner a writ of habeas corpus.

21

### 2. Destruction of Potentially Exculpatory
### Evidence as a Violation of Due Process (Ground 2)

Petitioner claims that the Commonwealth's loss and destruction of the audiotape of the telephone conversation between petitioner and his mother violated his due process right to a fair trial as guaranteed by the Fifth and Fourteenth Amendments. (#13, p. 11) He avers that because the Commonwealth did not preserve the audiotape, there is no way to know for certain what the tape may have revealed, and that thus there is a "real possibility" that the tape would have included exculpatory material. (#13, p. 12)

Additionally, petitioner argues that "it was the prosecutor's negligence...that caused the loss and destruction of the [tape of] the alleged telephone call between [petitioner] and his mother," and that therefore the Commonwealth was culpable for the destruction of potentially exculpatory evidence. (#13, p. 15) Finally, petitioner argues that the loss of the audiotape was highly prejudicial to the defense, since without it the testimony of Orel (that petitioner admitted to shooting Aiken) went essentially unchallenged to the jury, without any remedial action from the trial judge. (#13, p. 18)

Petitioner alleges a general violation of the rule of *Arizona v. Youngblood*,

488 U.S. 51 (1998), without describing the particular nature of the alleged constitutional due process violation.  Rather, petitioner relies upon the legal standard set forth in *Commonwealth v. Willie*, 400 Mass. 427, 432 (1987), which calls for the balancing of the culpability of the Commonwealth, the materiality of the evidence, and the potential prejudice to the defendant, a test which the trial judge applied in denying petitioner's motion in limine. (#9, Ex. 2).

Because  petitioner's arguments are focused on the state legal standard they do little to advance his cause here since a federal court may only grant a writ of habeas corpus if a state court decision was contrary to or an unreasonable application of clearly established *Federal law*.  However,  I will consider Judge Dunbar's Findings of Fact and Conclusions of Law (#9, Ex. 3) to the extent that they elucidate the question of whether the loss of the tape rises to the level of a violation of Federal constitutional due process.[8]

Constitutional claims regarding the destruction of potentially exculpatory evidence by the State are governed by *Youngblood* and *California v. Trombetta*, 467 U.S. 479 (1984).  *See also Illinois v. Fisher*, 540 U.S. 544 (2004).    In

---

[8]

Specifically, Judge Dunbar found that: "[t]here was insufficient evidence by the defendant that the lost and erased tape would be exculpatory." (#9, Ex. 3)

*Youngblood*, the court held that in missing evidence cases, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58. Further, the Court stated: "[t]he presence or absence of bad faith by the police for purposes of the Due Process clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Id*. at 56 n. 1. The "good or bad faith of the State" is irrelevant "when the State fails to disclose to the defendant material exculpatory evidence". *Id*. at 57; *see Brady v. Maryland*, 373 U.S. 83, 87 (1963). However, "the exculpatory value of the evidence must be apparent '*before* the evidence was destroyed.'" *Youngblood*, 488 U.S. at 56 n. 1, citing *Trombetta,* 467 U.S. at 489 (emphasis in original).

Because this interpretation of the Due Process clause may seem to put defendants in the untenable position of proving the exculpatory value of evidence which they have never possessed, the Court explains clearly why a showing of bad faith is required whenever the exculpatory value of the lost evidence is not readily apparent: "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." *Youngblood*,

488 U.S. at 57-58 (internal quotations and citation omitted). Furthermore, the Court stated its unwillingness to impose upon police an "...absolute duty to retain and...preserve all material that might be of conceivable evidentiary significance...." *Youngblood*, 488 U.S. at 57-58. Finally, the court stated: "[w]e think that requiring a defendant to show bad faith on the part of the police...limits the extent of the police's obligation to preserve evidence to reasonable bounds..." *Id. See also Fisher*, 540 U.S. at 548.          In the case at bar, petitioner has presented no evidence to show that the lost tape contained exculpatory material, only a list of speculative ways in which it might have been exculpatory. (*See , e.g.,* #13, p. 12) ("The tape could have proved that Officer Orel's translation of the call was not correct...")  Additionally, petitioner has presented no evidence to contradict Judge Dunbar's finding that "[t]here was insufficient evidence by the defendant that the lost and erased tape would be exculpatory." (#9, Ex. 3)  Therefore, since no evidence has been presented demonstrating that the lost tape was exculpatory, there is no due process violation unless it can be shown that the evidence was lost or destroyed as a result of the State's bad faith. *See Fisher*, 540 U.S. at 547-8, quoting *Youngblood*, 488 U.S. at 58 (emphasis in original) ("the failure to preserve... 'potentially useful evidence' does not violate due process '*unless a criminal defendant can*

*show bad faith on the part of the police.'")*

In the instant case, there is no evidence of bad faith on the part of the State.  Donato might have been negligent in failing to serve a subpoena on Kenney earlier than May 1, 2001, but negligence is not the same as bad faith. Petitioner argues in his brief that "the Commonwealth was responsible for the loss...of the audiotaped conversation." (#13, p. 14)   In support of this contention, he recites the following facts from the trial transcript:

> [t]he proper procedure for a prosecutor to preserve the audiotape of an inmate's telephone call is to serve a subpoena on officer Kenney's office specifically designating the tape to be saved...However, the prosecutor did not timely serve a subpoena; rather, the prosecutor did nothing more than leave a handwritten note on John Kenney's desk sometime after the telephone call was monitored, requesting Officer Kenney to save the tape of the telephone call.

(#13, p. 14)

However, petitioner has not offered any specific evidence to suggest bad faith on the part of the State.  The worst that can be inferred from petitioner's presentation of the facts is that Donato's conduct in failing to follow the "proper procedure" for preserving an audiotape was sloppy to the point of negligence. The constitutional rule of *Youngblood* and *Trombetta*, however, merely requires that the State refrain from withholding known exculpatory evidence from the

26

defense or acting in bad faith in destroying potentially exculpatory evidence.

Accordingly, since petitioner has produced no evidence either that the destroyed evidence contained exculpatory material or that its destruction was motivated by bad faith, the decision of the state court to allow Orel to testify regarding petitioner's telephone conversation with his mother was not a violation of due process as interpreted in *Youngblood* and *Trombetta*. Therefore, because the state court's decision was not "contrary to" or an "unreasonable application of" established Supreme Court precedent, there is no basis for habeas relief on Ground 2 of the petition.

## IV. Recommendation

For the reasons stated, I RECOMMEND that the petitioner's petition for writ of habeas corpus (#1) be DENIED and that judgment enter DISMISSING the case.

## V.  Review by the District Judge

The parties are hereby advised that pursuant to Rule 72, Fed. R. Civ. P. any party who objects to this recommendation must file a specific written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation.  The written objection must specifically identify the portion of the recommendation, or report to which

objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b), Fed. R. Civ. P., shall preclude further appellate review.  *See Keating v. Secretary of Health and Human Services*, 848 F.2d 271 (1 Cir., 1988); *United States v. Emiliano Valencia-Copete*, 792 F.2d 4 (1 Cir., 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1 Cir., 1983); *United States v. Vega*, 678 F.2d 376, 378-379 (1 Cir., 1982); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603 (1 Cir., 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).

*/s/ Robert B. Collings*
ROBERT B. COLLINGS
United States Magistrate Judge

January 25, 2007.

28